**MARKETING SPECIALISTS, INC., Plaintiff,**

v.

**David V. BRUNI, d/b/a Empire Hearing Aid Service, Defendants.**

**No. Civ. 88–960T.**

United States District Court, W.D. New York.

Dec. 22, 1989.

Howard Bloch, Rochester, N.Y., for plaintiff.

Irwin Gilbert, Rochester, N.Y., for defendants.

## OPINION AND VERDICT

KENNETH R. FISHER, United States Magistrate.

Plaintiff seeks recovery for breach of contract, breach of implied contract, in quasi contract, and in quantum meruit. The defendant pleads different terms of the contract and a breach by plaintiff of the contract, he admits unilateral termination of the contract (albeit by reason of plaintiff's breach), and he alleges that the contract is unenforceable because of illegality. Defendant counterclaims for "at least $40,-000.00" which sum is said to be comprised of (A) funds misappropriated by plaintiff and (B) the loss attending plaintiff's breach of its covenant to repair and/or replace as necessary malfunctioning hearing aids sold to consumers.[1] Plaintiff replies that the only warranty attending the hearing aids was written on the customer contracts themselves, that defendant is estopped from pleading the counterclaim by reason of his own misrepresentations, that defendant "ratified" all actions of the plaintiff said to contravene the agreement, and that plaintiff's actions said by defendant to be in derogation of the agreement, after defendant's unilateral termination, were in the nature of recoupment and mitigation of plaintiff's loss.

The matter was tried before me pursuant to 28 U.S.C. § 636(c) upon consent of the parties and by order of Chief Judge Michael A. Telesca, filed July 31, 1989. Also brought up for consideration are plaintiff's pre-trial motion for sanctions pursuant to Fed.R.Civ.P. 37, and motions made by the parties during trial to conform the pleadings to the proof. The following is my opinion and memorandum of decision finding the facts specifically in accordance with Fed.R.Civ.P. 52(a), and my disposition of the described motions. The parties agreed at the beginning of the trial that New York law governs the substantive contract law issues in this diversity action. Cf. Tehran–Berkeley Civil and Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton, 888 F.2d 239, 242 (2d Cir.1989).[2]

### A. Background: The Contract Between The Parties

The principal dispute between the parties concerns two terms of the contract alleged by plaintiff. Joseph Gerald Pannette (Pannette) is the chief officer of Marketing Specialists, Inc. (MSI) which manufactures hearing aids in Dubois, Pennsylvania. David Bruni is the principal officer of Empire Hearing Aid Service (Empire) which is a dealer duly registered in the State of New York in accordance with N.Y.Gen. Bus.Law § 788, et seq. Pannette testified that, in September of 1987, he hired Bruni at a $400.00 per week salary. Bruni's job during the first few weeks involved learning how to conduct hearing tests and how to promote and sell hearing aids. Accord-

---

1. The portion of defendant's counterclaim alleging loss of good will and requesting an additional $110,000 was dismissed by oral stipulation. The parties did not address in their stipulation the specific amount requested by defendant. Near the close of the sanctions hearing (see Part E, below), defense counsel agreed to prepare a stipulation for Chief Judge Telesca's signature (the parties had not yet consented to try the case before me), and he indicated upon questioning that a revised dollar figure would be incorporated into the stipulation. This task was never, despite repeated urging of plaintiff's counsel and the court, accomplished. A fair reading of the counterclaim, and defendant's several statements to the court during pre-trial and trial conferences, reveals the intent of defendant to maintain his request for "at least $40,000.00."

2. The parties also seem to agree that, with respect to the predominately service oriented arrangement described below, the Uniform Commercial Code does not apply. Esquire Radio & Electronics v. Montgomery Ward, 804 F.2d 787, 795 (2d Cir.1986). No contention has been made that, if the U.C.C. was applicable, any issue raised by the pleadings should be resolved differently than is called for by general contract law.

ing to Pannette, Bruni would also occasionally venture into the market as an "independent contractor" during this early period. Pannette testified that they "would take it a step at a time." Bruni's live-in companion, Theresa Buscemi, was also employed by MSI as a road secretary and office worker.

MSI promoted hearing aid sales through advertised "specials," often located in hotel or motel rooms. Pannette testified that, after a few weeks, he offered a deal to Bruni. Pannette testified that he explained the terms twice to Bruni, and that the arrangement was essentially the same one he had with dealers in other states. According to Pannette, the terms of the agreement were as follows:

1. MSI would arrange for promotion advertising, most often in a newspaper, announcing the "special" and inviting potential customers to come in to a motel room for a free hearing test. The parties would split the cost of the advertising equally.

2. Bruni would pay the cost of the motel room rental. (Although Pannette originally testified to a 50% split of the motel cost, his subsequent explanation of the calculations made to determine profit or loss made clear, as Bruni conceded in his testimony, *see infra*, that Bruni was expected to pay for the motels). Typically, the specials would run on Wednesday, Thursday and Friday.

3. The sales · force, consisting of so-called specialists and road secretaries, were to be provided by MSI together with the audiogram forms and other paperwork. Empire would pay 25% of the gross sales receipts achieved at the specials as a fee for these services.

4. Empire would pay the wholesale sales price for the hearing aids sold at the specials, which ranged from $159.00 to $227.50.

5. The parties would split the net profit obtained, or net loss suffered, after the above calculations had been completed (except that the net profit or loss figure takes into account the entire advertising cost).

6. MSI would carry any installment sales financed by a customer, but the calculation of the parties' respective positions after each special would be made on the basis of the gross sales price of the hearing aid, whether financed or not.

Pannette testified that Bruni accepted these terms.

The specials were arranged by MSI and were run virtually every week, except during holiday periods. The entire sales force would typically leave Dubois, Pa. in time to reach the site of the several specials on Wednesday. Those answering the ad by coming to the motel would be "tested" and, if a sale was indicated, an Empire Hearing Aid Service contract would be filled out and signed. MSI personnel also kept "cash sheets" logging the sales together with other forms and information required by New York regulations (discussed below).

At the conclusion of the specials, the entire sales force travelled to Dubois with the cash proceeds (either check, cash or credit card slips) where that week's transactions were processed and recorded. The checks were copied at MSI headquarters. Some money was deposited in several of MSI's various bank accounts; other money was deposited in Empire's account in Rochester, New York. Plaintiff claims that a written reconciliation of the week's activity, showing the calculations according to the contract specified above, was prepared by MSI employee Melinda Ishman on Saturdays. Plaintiff claims further that these written reconciliations, known to the parties as "Recap Sheets," were given to Bruni the following Monday. The Recap Sheets were introduced as part of Exhibits 1–9 (the "A" series, meaning Exh. 1A, 2A, et seq.), representing the nine "weeks" of the relationship. The cash sheets were introduced also in the same exhibits as the "C" series, and the contracts, patient analysis charts, Empire contracts, delivery slips, and other required paperwork pertaining to each sale were introduced in Exhibits 1–9 as the "B" series.

Bruni admitted the key conversation with Pannette and he admitted that Pannette described to him the "usual deal" he had with dealers at that time. But Bruni denied receipt of the Recap Sheets and he testified to a significantly different arrangement between he and Pannette. Bruni's description of Pannette's "usual deal" mirrored Pannette's version except in two respects. First, Bruni claimed that Pannette offered all of his hearing aids at a $150.00 wholesale cost, regardless of variety. Second, Bruni denied the provision in the contract calling for an equal split of the profit or loss. Bruni conceded the other terms of the agreement as testified to by Pannette, including his understanding that he would bear the entire motel cost.

As a separate matter, Bruni also testified that he and Pannette had an agreement to service a sale jointly in the case of an unsatisfied customer. Empire would "service" the customer at his or her home or by telephone from the Empire office in Rochester. If remedial work was needed, MSI would service or replace the hearing aid. As part of this agreement, Empire would often extend the customer's 30 day cancellation period, well beyond the original delivery date, to exclude the repair or replacement period, in an effort to "save" the sale. Bruni testified, without contradiction from Pannette (except to observe in his testimony that the practice was rare), that MSI acquiesced in these arrangements.

The plaintiff seeking recovery has the burden to show that the contract was made. *Apex Oil Company v. Vanguard Oil & Service Co., Inc.*, 760 F.2d 417, 425 (2d Cir.1985) (Oakes, J., concurring). In addition to proving the oral terms of a contract, "the existence of a contract may be established through conduct of the parties recognizing the contract." *Id.* 760 F.2d at 422.

Determination as to the existence of a contractual agreement and its terms depends, not upon the subjective intent of either of the parties [citations omitted], but rather upon "the objective manifestations of intent of the parties as gathered by their expressed words and deeds."

(*Brown Bros. Elec. Contrs. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 [393 N.Y.S.2d 350, 361 N.E.2d 999].) It is necessary that the totality of all the acts of the parties, their relationship and their objectives be considered in order to determine whether they entered into an oral agreement ...

*P.J. Carlin Construction Company v. Whiffen Electric Co., Inc.*, 66 A.D.2d 684, 411 N.Y.S.2d 27 (1st Dept.1978). The New York courts also precondition recovery upon proof of "an agreement ... reasonably certain in its material terms," in the absence of which "there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. The Henry and Warren Corporation*, 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989). Without reasonable certainty of terms, a court "cannot know whether the contract has been breached, ... it cannot fashion a proper remedy," and it cannot be "assure[d] that ... [it] will not impose contractual obligations when the parties did not intend to conclude a binding agreement." *Id.* 74 N.Y.2d at 482, 548 N.Y.S.2d 920, 548 N.E.2d 203. In other words, the requirement of reasonable certainty prevents a court from "imposing its own conception of what the parties should or might have undertaken, rather than confining itself to a bargain to which they have mutually committed themselves." *Bernstein v. Felske*, 143 A.D.2d 863, 864–65, 533 N.Y.S.2d 538 (2d Cir.1988). *See Best Brands Beverage v. Falstaff Brewing Corporation*, 842 F.2d 578, 587–88 (2d Cir.1987); 1 A. Corbin, *Corbin on Contracts* § 95 at 398–99, 407–08 (1962).

On the other hand, "at some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract." *Cobble Hill Nursing Home, Inc. v. The Henry and Warren Corporation*, 74 N.Y.2d at 483, 548 N.Y.S.2d 920, 548 N.E.2d 203. "While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be 'pedantic or meticulous' in

interpreting contract expressions." *Id.* 74 N.Y.2d at 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (quoting 1 A. Corbin, *Corbin on Contracts* § 95, at 396 (1963)).

Pannette and Bruni did not reduce their agreement to a writing, nor did they manifest an intention to commit the matter to a writing. Despite plaintiff's anticipation of a statute of frauds defense in a trial brief, defendant does not raise it as a bar to recovery. *Cf. Apex Oil Co. v. Vanguard Oil & Service Co., Inc.*, 760 F.2d at 422–23 n. 4; *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F.Supp. 127, 148 (S.D.N.Y.1988). *See also, id.*, 700 F.Supp. at 148 n. 23 (because the "agreement was not for a specified duration, . . . it falls outside the scope of the statute of frauds"). "Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). *See also, Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir.1986) ("Notwithstanding the absence of a written agreement, courts applying New York law recognize other enforceable obligations, including oral contracts, . . .")

The court is faced with the conflicting versions of the agreement offered by Bruni and Pannette. No other witness offered personal knowledge of the conversations in which the agreement was made. The parties' principal disagreement concerns (A) the wholesale price for the hearing aids and (B) whether a provision existed for an equal split of the net profit or loss after the "cost" of the specials (as specified above) had been calculated. As part of an effort to show Bruni's understanding of Pannette's terms, plaintiff offered the "Recap Sheets" which Melinda Ishman claimed were given to Bruni on a weekly basis without objection. Exhibits 1–9 (the "A" Series). Although I do not believe the Recap Sheets were ever prepared until defendant left Dubois,[3] the testimony of the plaintiff concerning these two terms of the contract was credible. Defendant's testimony was less convincing in many areas and, with respect to these two terms, his protestations that he would never have agreed to them and that he would have cancelled the relationship with MSI if he had discovered them, was contrived and wholly unpersuasive. For example, Bruni's claim in his testimony toward the end of the trial that he was unaware of the advertising expenses, and that if he had known of the figures (some $62,000) he would have cancelled the agreement, was particularly wanting. He had earlier testified that Exhibits A1–A19, pre-signed checks totalling $69,418.19, represented Empire's share of the advertising expenses and the hotel costs he agreed to pay. According to Bruni's testimony earlier in the trial, those checks were otherwise entirely unrelated to the sums MSI ultimately would have been entitled to under the agreement. Thus, if he did not know the face amount of the checks because he was asked to pre-sign them, Bruni had ready means to ascertain the advertising expenses incurred simply by examining his own bank records containing the cancelled checks.

Bruni's version of the agreement is also belied by his concession that Pannette described to him the "usual deal" given to dealers. He offered no evidence that any other dealer of MSI had the same terms as he claimed respecting wholesale price and net profit or loss. Nor did he offer any explanation why Pannette would charge a flat wholesale fee for hearing aids having varying production costs. His attempt to prove that no profit/loss split was part of the agreement consisted in large part of efforts to prove that the other financial terms gave Pannette sufficient revenue for each transaction. While the "need" for such an additional financial term may be relevant to it's alleged existence in a close case, Pannette's and Bruni's testimony es-

---

**3.** Though a friend of Bruni, I credit the testimony of Kimberly Senglaub, a former executive secretary of MSI, that Ishman only began preparing the Recap Sheets in response to Pannette's directive, after defendant left Dubois, to prepare the paperwork for litigation against Bruni.

tablished that their bargain was struck on the basis of the terms Pannette "usually" gave to his other dealers. On this subject, the testimony showed unequivocally that Pannette charged his dealers varying wholesale costs and that he split the net profit or loss.

Indeed, another dealer, Donald Trizzino, who sold for Pannette in Ohio during the same time period of Bruni's contract, testified that he eventually went out on his own without MSI's assistance to avoid the profit split. In answer to my question, he stated simply, "Why split the profit?" Whether or not Trizzino had a sufficient motive to testify falsely for Pannette, as defendant contends, this answer, which appeared naturally given and without affectation, was damaging evidence contradicting Bruni's testimony concerning Pannette's "usual deal" with his distributors. The testimony firmly established that Trizzino's Recap Sheets were prepared and delivered on a weekly basis. This testimony was also corroborated by admission of Trizzino's "Recap Sheet" for the week ending November 20, 1987 (Exh. #36)

which contained the "per ½" calculation, and which appears wholly authentic. *See Cibro–Petroleum Products, Inc. v. Sohio Alaska Petroleum, Co.*, 602 F.Supp. 1520, 1551–52 (N.D.N.Y.1985), *aff'd*, 798 F.2d 1421 (Temp.Em.Ct.App.1986) (adopting opinion below); Fed.R.Evid. 406. Bruni's testimony in these respects is not worthy of belief. Both parties testified that the usual deal was described by Pannette and was understood and asserted to by Bruni. I find that Pannette's version of what he said described the contract Bruni.[4]

On the other hand, Bruni's description of the parties' practice when a customer required service, and the understanding they had concerning the cancellation policy is entitled to belief. Together with Exhibit KKK, which Pannette conceded was a cancellation sanctioned by him outside the thirty day period specified in the customer contracts, Bruni's testimony clearly established an express or an implied promise by Pannette to cooperate with Bruni in an effort to satisfy the customer, by means of servicing or replacing defective hearing aids and by extending the thirty day cancellation period during the service or replace-

4. Defendant testified toward the end of the trial that, in one of his discussions with Pannette, Pannette told him that, in addition to his $400 per week salary, he could expect to make about $1,000.00 more at a "minimum." Bruni's friend, Neal R. Senglaub, who worked for Pannette at the time, confirmed this conversation in his testimony, but stated that Pannette's figure was $700–$750. As Senglaub made clear, however, these figures were "estimates." They could not form the basis of an oral contract because, in view of the specific terms of the "usual deal" Bruni agreed to, such figures were not communicated to Bruni "under such circumstances that . . . [defendant would understand it as a promise to pay, and under which defendant might] reasonably act in reliance upon the expression." 1 Corbin, *Corbin on Contracts* § 15 at 32 (1963). *See* E. Allan Farnsworth, *Contracts* § 3.6, at 114–15 (1982); J. Calimari & J. Perillo, *Contracts* § 2–6 at 34–36 (3rd ed. 1987). These figures may have been what the parties hoped or wanted the business in New York to produce, *Bernstein v. Felske*, 143 A.D.2d 863, 865, 533 N.Y.S.2d 538 (2d Dept. 1988) ("mere wish or desire"), but the testimony "in no way established that the parties actually agreed upon the various and specific" figures alleged by Bruni to have been estimated by Pannette. *Best Brands Beverage v. Falstaff Brewing Corporation*, 842 F.2d 578, 590 (2d Cir.

1988). Moreover, Bruni did not testify that he understood Pannette's estimates as stating material terms of their contract or as promises that so much would be realized. *Merritt Hill Vineyards Incorporated v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 112, 472 N.Y.S.2d 592, 460 N.E.2d 1077 (1984) ("A promise is 'a manifestation of intention to act or refrain from acting in a prescribed way, so made as to justify a promise in understanding that a commitment has been made.'") (quoting A.L.I. Restatement (Second) Contracts § 2, subdiv. 1). Rather, his attempt appeared to be, solely, to establish that the estimates were misrepresentations.

Bruni admitted, however, that Pannette's estimates were made in a different conversation, after the one in which Pannette explained to him the terms he gave dealers. Bruni could not have relied on these estimates, which had not yet been given, when he agreed to the dealership terms described to him by Pannette. Moreover, in view of the easy calculations provided by the contract terms explained to Bruni, either under his version or Pannette's version, Bruni could not have reasonably relied on these estimates as an inducement to enter into the agreement, even if they were misrepresentations. *Leasco Corporation v. Taussig*, 473 F.2d 777, 783 (2d Cir.1972).

The $400 per week salary is not at issue in this lawsuit.

ment interval. *William Wrigley Jr. Company v. Waters*, 890 F.2d 594 (2d Cir.1989). Even if an express or implied agreement was not created as to these terms, and even though he described the situation as "rare," Pannette obviously gave every reason to Bruni to rely on his support of the practice if circumstances warranted an extension. Pannette's testimony that Exhibit KKK involved the only case of an extended cancellation period was not convincing. The parties obviously undertook every effort to "save" a sale. Having failed to contradict or otherwise dispute defendant's proof that similar circumstances justifying an extension existed in the several other instances testified to by Bruni, I find that the instances of cancellation extensions, of ultimate cancellations within the extended period, and the service or replacement expenses incurred by Bruni, all have binding consequences on plaintiff. *Canterbury Realty and Equipment Company v. Poughkeepsie Savings Bank*, 135 A.D.2d 102, 107, 524 N.Y.S.2d 531 (3rd Dept.1988). *See also, Arcadian Phosphates, Inc. v. Arcadian Corporation*, 884 F.2d 69, 73 (2d Cir.1989); *Esquire Radio & Electronics v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 793 (2d Cir.1986).

That an agreement was made between the parties upon the material terms specified above does not determine whether defendant or plaintiff committed a breach and what remedies are appropriate. As a preliminary matter, however, defendant interposes an illegality defense which might obviate the inquiry. I turn to consideration of this defense before examining the course of the agreement, and the parties' respective claims of breach.

## B. *The Question of Illegality*

Defendant contends that the contract, whatever its financial terms, may not be enforced because it contravenes N.Y.Gen. Bus.Law §§ 788, et seq. "Under both federal and state law, illegal agreements, as well as agreements contrary to public policy, have long been held to be unenforceable and void [citations omitted], and even where a contract is not itself unlawful, the bargain may still be illegal under New York law if it is closely connected with an unlawful act." *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir.1989). *See McConnell v. Commonwealth Pictures Corporation*, 7 N.Y.2d 465, 469–71, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960) (distinguishing illegalities which "are merely incidental to the contract sued on"); *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (1948). Diversity cases within the circuit applying New York law on this point include, *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 83–84 (2d Cir.1982); *Anabas Export Ltd. v. Alper Industries, Inc.*, 603 F.Supp. 1275, 1276–78 (S.D.N.Y.1985); *Walters v. Fullwood*, 675 F.Supp. 155, 160–62 (S.D.N.Y. 1987). In *Walters*, Chief Judge Brieant observed:

> Even in the context of a non-criminal contract, "a prime and long-settled public policy closes the doors of our courts to those who sue to collect the rewards of corruption." *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 469, 199 N.Y.S.2d 483, 485, 166 N.E.2d 494, 496 (1960). As Professor Walter Gellhorn wrote more than half a century ago, "where legislative materials are used as sources of information and as analogies, there need be no direct connection in terms between statutes and the contract under judicial consideration." Gellhorn, *Contracts and Public Policy*, 35 Colum.L.Rev. 679, 692 (1935). *See also, Stamford Bd. of Educ. v. Stamford Educ. Ass'n*, 697 F.2d 70, 73 (2d Cir.1982) ("courts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society").

*Walters v. Fullwood*, 675 F.Supp. at 161–62. The effects of the rule are harsh. Faced with a lawsuit to enforce an illegal bargain, the courts "should and do leave the parties where we find them." *Id.* 675 F.Supp. at 161. *See Anabas Export Ltd. v. Alper Industries, Inc.*, 603 F.Supp. at 1278 ("the cases hold that '[w]here the parties' arrangement is illegal the law will not extend its aid to either of the parties or listen

to their complaints against each other, but will leave them where their own acts have placed them'") (quoting *United Calendar Mfg. Corp. v. Huang,* 94 A.D.2d 176, 180, 463 N.Y.S.2d 497 (2d Dept.1983)). As then-Judge Cardozo put it, "we will not stir a step in furtherance of an illegal scheme." *Postal Telegraph Cable Company v. The Associated Press,* 228 N.Y. 370, 381, 127 N.E. 256 (1920). *See also, id.* 228 N.Y. at 375, 127 N.E. 256 ("the obligation of the law qualifies, and, in cases of conflict, overrides, the obligation of the contract."); *Carrier v. Carrier,* 226 N.Y. 114, 123, 123 N.E. 135 (1919) (Cardozo, J.) (the courts "will leave the parties where it finds them").

Given the harsh application such a rule would have in this case, the proffered illegality bears close scrutiny. The statute provides that "no person [including a business organization] ..., shall engage in the business of the fitting and selling ... of hearing aids unless such business is registered ... and unless such registration is current and valid." N.Y.Gen.Bus.Law § 790(1)(a). Violation of the statute is made "a misdemeanor punishable by payment of a fine not to exceed one thousand dollars." N.Y.Gen.Bus.Law § 790(1)(b). The statute expressly excludes from its operation "an individual employed by a person duly registered," N.Y.Gen.Bus.Law § 790(1)(a), "an otorhinolaryngologist or licensed audiologist," N.Y.Gen.Bus.Law § 789(g), (h), (i), and it excludes "wholesale transactions of dealers and distributors." N.Y.Gen.Bus.Law § 789(e). The statute contains a number of provisions regulating several aspects of the retail hearing aid business, a violation of any one of which is declared a misdemeanor punishable by a $1,000.00 fine. N.Y.Gen.Bus.Law § 792. Regulations promulgated by the New York Secretary of State govern further the registration process and the retail trade in hearing aids. 19 N.Y.C.R.R. § 191.1 et seq. As stated by one New York court, "the purpose of the statutory scheme ... is to protect the public from the 'widespread abuses in the hearing aid industry' resulting from the sale of substantial numbers of hearing aids to persons who did not need

them." *New York Hearing Aid Society, Inc. v. Children's Hospital and Rehabilitation Center of Utica,* 91 A.D.2d 333, 458 N.Y.S.2d 663, 664 (2d Dept.1983). The statute itself declares that "[t]he fitting and selling of hearing aids ... affect[s] the public health and welfare, and is subject to regulation in the public interest." N.Y. Gen.Bus.Law § 788.

Empire's agreement with MSI in this matter was not itself illegal. But the agreement, at least as envisaged by plaintiff and surely with the knowledge of defendant, contemplated conduct declared illegal by the statute. The testimony shows unequivocally that Pannette desired to do business in New York. He had just recently been forced out of business in Jamestown by an investigation of the state Attorney General. Pannette quickly cultivated Bruni, who was duly registered in New York and whose father had previously done business with Pannette. He offered Bruni a position in sales with a $400.00 weekly salary. As a former manager at MSI testified, Pannette saw Bruni as his "license" to re-enter New York. Unlike his arrangements with established dealers in Ohio, New Jersey, Virginia and West Virginia, Pannette controlled virtually every aspect of Empire's retail operation. He determined retail price, advertising cost, target towns for the sales "specials," and the hotel or motel reservations for the sales themselves and, presumably, the sales force. He required all funds to pass through his employees at Dubois, Pa. for record keeping before permitting deposits in the Empire accounts in Rochester. Most important, he hired and provided virtually all sales personnel. The sales force was employed by MSI, not Empire. Both Bruni and his live-in companion, Theresa Buscemi, were MSI employees. As an example of the virtually complete control plaintiff had of the sales operation, Pannette's wife and employee confiscated Empire's checkbook. She required Bruni to pre-sign blank checks for expected advertising expenses. In sum, Empire's only connection with the New York sales effort was in providing its name for the sales contracts and in provid-

ing some services from its Rochester office for the customers, especially the disgruntled ones.

Abundant evidence was adduced at the trial that MSI "engage[d] in the business of fitting and selling" of hearing aids within the meaning of N.Y.Gen.Bus.Law § 790(1)(a). On no reasonable view of the evidence could it be concluded otherwise. Furthermore, it is especially significant that the parties contemplated that more than one "special" would be run within a particular week in New York. Because Bruni and his one employee (Buscemi) could not themselves attend all such specials, the contract between MSI and Empire necessarily called for performance by MSI violative of the statute and declared a misdemeanor. The arrangement was specifically designed to evade the regulatory purpose of the statute. Simply put, the illegality was not "merely incidental to the contract sued on." *McConnell v. Commonwealth Pictures Corporation,* 7 N.Y.2d at 471, 199 N.Y.S.2d 483, 166 N.E.2d 494. *See Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d at 83–84.

■ Establishing all this does not automatically entitle defendant to judgment, however. New York sometimes recognizes an exception to the "illegality" defense if the illegality relied upon involves registration or licensing statutes. The leading cases are *Rosasco Creameries, Inc. v. Cohen,* 276 N.Y. 274, 11 N.E.2d 908 (1937) (applying the exception) and *Richards Conditioning Corporation v. Oleet,* 21 N.Y.2d 895, 289 N.Y.S.2d 411, 236 N.E.2d 639 (1968) (limiting the exception). In *Rosasco,* which involved the sale of milk by an unlicensed dealer to other milk dealers who refused to pay, the Court of Appeals declined to follow its earlier decision in *Johnston v. Dahlgren,* 166 N.Y. 354, 59 N.E. 987 (1901) which denied recovery for the price of unlicensed plumbing services. The court acknowledged the general rule that "[i]llegal contracts are generally unenforceable" (*id.* 276 N.Y. at 278, 11 N.E.2d 908), but concluded that recovery should be allowed for two primary reasons. First, the milk licensing statute provided a crimi-

nal penalty, and did not evince a legislative intent to declare contracts in derogation thereof unenforceable. Because the unlicensed sale of milk is "merely *malum prohibitum,*" which meant that it "does not endanger health or morals, such additional punishment should not be imposed unless the legislative intent is expressed or appears by clear implication." *Id.* 276 N.Y. at 280, 11 N.E.2d 908. In the context of so called *malum prohibitum* statutes, "[i]f the statute doe not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to recover will not be denied." *Id.* 276 N.Y. at 278, 11 N.E.2d 908. The second primary reason for the court's holding was the additional conclusion that, notwithstanding "[t]he primary purpose of the statute ... to protect producers and the consuming public," *id.* 276 N.Y. at 280, 11 N.E.2d 908, the defendant milk dealers, who refused to pay, were not within either class of protected individuals. *Id.* 276 N.Y. at 280, 11 N.E.2d 908.

In *Richards Conditioning Corporation v. Oleet, supra,* the Court of Appeals denied recovery to an unlicensed installer of air conditioning systems. The court stated simply, "Since the purpose of the regulatory scheme is to protect the public health and safety, lack of an installer's license bars recovery on the agreement." *Id.* 21 N.Y.2d at 896–97, 289 N.Y.S.2d 411, 236 N.E.2d 639. The non-paying defendant was unquestionably within the class of persons for whose benefit the regulatory scheme was enacted. Yet no effort was made to show how the regulatory scheme in *Richards Conditioning* differed functionally from that in *Rosasco,* nor was there any objectively verifiable reason to believe that the unlicensed sale of milk was any less "*malum prohibitum,*" or endangering of health and morals, than the unlicensed installation of the air conditioning system in *Richards Conditioning.* Indeed, there is no indication that the system in *Richards Conditioning* was installed in a faulty manner or in violation of code

requirements. *Id.* 21 N.Y.2d at 896, 289 N.Y.S.2d 411, 236 N.E.2d 639 ("the finding of substantial performance is supported by the record"). The differences between *Rosasco* and *Richards Conditioning* appear to be (1) the non-paying defendant in *Richards Conditioning* was within the class of individuals intended to be protected by the statute, and (2) the licensing scheme in *Richards Conditioning* affected public health and safety.

Application of the *Rosasco* exception and the *Richards Conditioning* limitation has not been altogether predictable in the New York courts, however. The court in *Thistle v. Englert,* 103 A.D.2d 268, 479 N.Y. S.2d 921 (4th Dept.1984) permitted recovery by an unregistered automobile repair shop even though the statute was remedial and notwithstanding that the non-paying customer was clearly within the class of persons intended to be protected by the regulatory scheme. *Id.* 103 A.D.2d at 269 & n. *, 479 N.Y.S.2d 921. The court examined the statutory scheme further (i.e., beyond whether the regulation protected the public welfare), and determined that "the public interest in the enforcement of contracts is clearly outweighed by the public policy behind the regulation." *Id.* 103 A.D.2d 270, 479 N.Y.S.2d 921. Specifically, the court concluded that the registration requirements themselves were the "linchpin of the entire regulatory scheme," *id.* 103 A.D.2d at 271, 479 N.Y.S.2d 921, and that its task in such circumstances was to "strike an appropriate balance which furthers the goals established by the Legislature without causing disproportionate and unintended hardship to the unregistered defendant." *Id.* 103 A.D.2d at 270, 479 N.Y.

S.2d 921. On the other hand, the court in *Thistle* placed heavy emphasis on the omission in the statute of a criminal penalty, *id.* 103 A.D.2d at 271–72, 479 N.Y.S.2d 921, notwithstanding that in *Rosasco*, the operative distinction was whether, if a criminal penalty existed, it referenced conduct "merely *malum prohibitum.*" *Rosasco Creameries, Inc. v. Cohen,* 276 N.Y. at 278, 280, 11 N.E.2d 908.[5] The court seemed to distinguish *Richards Conditioning* by reference to the lack of a criminal penalty. *Thistle v. Englert,* 103 A.D.2d at 272, 479 N.Y.S.2d 921.

The search for a unitary approach, or a unitary rationale, of the licensing exception to the illegality doctrine in New York's law of contracts is, therefore, strained at best. The difficulty is illustrated by the contrasting majority and concurring opinions in the very recent case of *Todisco v. Econopouly,* App.Div., 547 N.Y.S.2d 103 (2d Dept.1989). The majority relied on *Richards Conditioning* to deny recovery to a home improvement contractor unlicensed at the time of performance despite his procurement of a license prior to commencement of the action. The court stated in terms no more elucidating than those in *Richards Conditioning,* "Local licensing provisions, such as that contained in the Nassau County Administrative Code, provide protection of the public health and safety." *Id.* 547 N.Y.S.2d at 104. In this, the court was adopting the decision and the result in *Zandell v. Zerbe,* 139 Misc.2d 737, 528 N.Y.S.2d 779 (N.Y. City Civ.Ct., 1988), which has been described by one noted commentator of New York law as "tilt[ing] to the draconian." N.Y.Civ.Prac.Law & R. 3015(e) Supplementary Practice Commentaries

**5.** The malum prohibitum/malum in se distinction has taken other forms. For example, the courts distinguish licensing or registration schemes which have a regulatory purpose from those which merely raise revenue, *see East Coast Moving & Storage, Inc. v. Flappin,* 78 Misc.2d 140, 145, 355 N.Y.S.2d 525 (N.Y.City Civ.Ct.1974); 6A A. Corbin, *Corbin on Contracts* § 1512 (1962), although even in cases of a public welfare regulation contract enforcement is not always denied. *Thistle v. Englert,* 103 A.D.2d at 270, 479 N.Y.S.2d 103 (denial of enforcement "is tenable, however, only if the public interest in the enforcement of contracts is clearly outweighed by the public policy behind the regulation"); 6A A. Corbin, *Corbin on Contracts* § 1512, at 712–13; *Restatement (Second) of Contracts* § 181 (1981). The Latin phrase appears in the modern cases occasionally, *e.g., Lloyd Capital Corporation v. Pat Henchar, Inc.,* App.Div., 544 N.Y.S.2d 178, 179–80 (2d Dept. 1989), but its use has been criticized. 6A A. Corbin, *Corbin on Contracts* § 1378; E. Allan Farnsworth, *Contracts* § 5.5, at 349 (1982). The attempt here, where the term is used, is to have reference to the functional meaning of the phrase in the context of a particular court's opinion, such as in *Rosasco.*

C3015:6, 7B *McKinney's Consolidated Laws of New York Annotated* (1989 Supp. at 7) ("the licensing provisions are designed to protect the potential victims of unscrupulous contractors. They aren't designed to make decent but misguided contractors the victims of unscrupulous customers.")

The concurring opinion in *Todisco,* written by Justice Albert Rosenblatt, emphasized that the "substantial body of law" in New York "dealing with suits by unlicensed artisans, sellers, or suppliers, and the history of this issue illustrates that it is by no means one sided." *Todisco v. Econopouly,* 547 N.Y.S.2d at 106. Justice Rosenblatt would not "trea[t] all licensing schemes alike, regardless of their goals or the class of people or activities that are to be covered." *Id.* 547 N.Y.S.2d at 106. He concluded:

> *Rosasco (supra,)* has never been overruled, and indeed has co-existed with *Richards* (see, e.g., *Murray Walter, Inc. v. Sarkisian Bros.,* 107 A.D.2d 173 [486 N.Y.S.2d 396]; *Cohen v. Daughters of Sarah Nursing Home Co.,* 79 A.D.2d 1042 [435 N.Y.S.2d 190]) as enduring authority for the proposition that courts are free to, and should, examine the particular regulatory scheme involved and decide how to further the purposes of the statute compatibility with what is fair.

*Todisco v. Econopouly,* 547 N.Y.S.2d at 107 (Rosenblatt, J., concurring).

Justice Rosenblatt is supported by recent New York Court of Appeals authority. That court expressly declared that *Richards Conditioning* and its progeny "do not erect an absolute or per se rule." *Charlebois v. J.M. Weller Associates, Inc.,* 72 N.Y.2d 587, 593, 535 N.Y.S.2d 356, 531 N.E.2d 1288 (1988). The court went further to say that, even if the proffered licensing violation in that case had actually occurred, "the public policy that underlies the statute would not be furthered by complete avoidance of this contract." *Id.* 72 N.Y.2d at 595, 535 N.Y.S.2d 356, 531 N.E.2d 1288. While not relying on *Rosasco,* the majority opinion directed courts to the very considerations of "commercial realities of the arm's length transaction,"

"disproportionate and unnecessary remedy," adequacy of the regulatory scheme itself, and the possibility of unjust enrichment, which compelled the decisions in *Rosasco* and *Thistle v. Englert, supra. Charlebois v. J.M. Weller Associates, Inc.,* 72 N.Y.2d at 595, 535 N.Y.S.2d 356, 531 N.E.2d 1288. Most telling, the majority concluded its opinion with a poignant observation:

> [F]orfeitures by operation of law are strongly disfavored as a matter of public policy and the Charleboises' efforts to use that concept as a sword for personal gain rather than a shield for the public good should not be countenanced in the name of Education Law public policy, slavishly applied. The legislative objective, after all, is professional performance—a matter of substance—not the vehicle of professional performance—a matter of form.

*Id.* 72 N.Y.2d at 595, 535 N.Y.S.2d 356, 531 N.E.2d 1288. Accordingly, the New York Court of Appeals has apparently charted a course away from the "absolutism" *Richards Conditioning* would otherwise seem to require. *Id.* 72 N.Y.2d at 595, 535 N.Y.S.2d 356, 531 N.E.2d 1288.

Even if *Johnston v. Dahlgren, supra,* and *Richards Conditioning* may be said to create an absolute or per se rule in certain cases not covered by the *Charlebois* opinion, this commercial dispute is not one of those cases to which such a rule should be directed. The *Richards Conditioning* rule is intended to deal with contracts between the unlicensed supplier and retail, or end-of-the-line, consumers of the supplier. *See e.g., Parker v. Vista Construction Concepts, Inc.,* 134 Misc.2d 1, 2, 511 N.Y.S.2d 458 (Sup.Ct.App. Term, 2d Dept.1986). It was not intended to deny recovery to arms length commercial transactions such as is involved in this case between dealers, or between wholesale suppliers and dealers, or, as in *Parker,* between contractors and subcontractors. *Id. See also, J.R. Kemp Scenic Services, Inc. v. Lucien,* unpublished, 1988 WL 125669 (S.D.N.Y. No. 87 Civ. 2520, November 15, 1988) (Sand, J.) ("A subcontractor performing home improvement work does not necessarily have

to be licensed to enforce a contract against a contractor.") (citing, *Contract Woodworking Corp. v. NICO Construction Company, Inc.*, order of March 24, 1988, N.Y.L.J., April 4, 1988, at 14, col. 1, which was subsequently affirmed without opinion, *id.*, 148 A.D.2d 334, 538 N.Y.S.2d 890 (1st Dept.1989)).[6] *Cf. Zimmett v. Professional Acoustics, Inc.*, 103 Misc.2d 971, 431 N.Y.S.2d 243 (Sup.Ct.App. Term, 1st Dept. 1980) (although recovery denied to unlicensed subcontractor who contracted with a licensed general contractor, the lawsuit was between the homeowner and the unlicensed subcontractor).

■ To the extent that the *Richards Conditioning* rule has absolute or per se application, notwithstanding *Charlebois* and *Thistle v. Englert, supra*, it is confined in its application to the class of individuals targeted for protection by the regulatory scheme. The defendant in this case, who is a dealer in hearing aids, is not one of those targeted by N.Y.Gen.Bus.Law § 788 et seq., nor is the agreement between the plaintiff and defendant one of those intended to be regulated by the statute. If this lawsuit had been brought by plaintiff against one of the consumers served by plaintiff's employees only, for payment or for collection of the financed amount of the sale, the *Richards Conditioning* rule would be invoked. Recovery would be denied even if plaintiff protested in response to the illegality defense of the customer, that its agreement was with defendant, a licensed dealer, not the consumer. *Zimmett v. Professional Acoustics, Inc.*, 103

Misc.2d at 973–74, 975–76, 431 N.Y.S.2d 243. This case, however, does not involve such a suit, notwithstanding that the agreement at issue here called for conduct of the plaintiff declared illegal by the statute.

For that conduct, plaintiff should be, and the testimony of the Assistant Attorney General shows that he was, subject to the full panoply of the regulatory scheme applicable to hearing aid sales. But he should be subject to no other sanctions. Indeed, the relative seriousness or essentialness of the criminal sanctions to the regulatory scheme was revealed fully by the Assistant Attorney General's testimony, which showed that the consumer affairs division lost interest in Mr. Pannette after his relationship with defendant ended. It is not essential to the regulatory scheme, nor is there reason to suspect, that the legislature thought it important to void contracts of the kind involved here which contemplate conduct violative of the statute. Had the legislature intended to focus on the dangers inherent in a too-close relationship between an unlicensed manufacturer and licensed dealer, it could easily have enacted provisions regulating such arrangements. Instead, the legislature simply "exclud[ed] wholesale transactions of dealers and distributors" from the definition of a hearing aid "sale." N.Y.Gen. Bus.Law § 789(e). Accordingly, the court is free to apply the *Rosasco* exception, as elucidated in *Thistle v. Englert, supra*, and Justice Rosenblatt's concurring opinion in *Todisco v. Econopouly, supra*, in its resolution of this contractual dispute.[7]

---

**6.** The citation of *Contract Woodworking* in Judge Sand's opinion contains a typographical error. The case at *nisi prius* appeared in the April 4th issue of the New York Law Journal, not the April 14th issue. The decision relied on *Parker v. Vista Construction Concepts, Inc., supra*, cited in the text, above.

**7.** I have considered whether to formulate a remedy which effectively "sever[s] the lawful from the unlawful obligations of the contract for enforcement purposes" *Murray Walter, Inc. v. SarKisian Brothers, Inc.*, 107 A.D.2d at 178, 486 N.Y.S.2d 396. *See* 6A A. Corbin, *Corbin on Contracts* § 1534, at 819 (1962) ("there is danger of jumping to a conclusion, either refusing all remedy in the belief that the 'illegal' is bad and that no 'bad' man deserves relief, or granting a

remedy without sufficient regard for what the public interest requires.") An example of such a severance in the licensing context is *Food Management, Inc. v. Blue Ribbon Beef Pack, Inc.*, 413 F.2d 716, 725–26 (8th Cir.1969) (plaintiff entitled to recovery "under the severable enforceable part of the contract for those services rendered ... which were not violative of the Iowa registration statutes"). In this case, such a remedy would deny plaintiff the 25% of gross sales price earmarked by plaintiff for the personnel and services provided for the sales effort in New York. It is these services which most directly contravene the registration provisions of N.Y.Gen.Bus.Law § 788 et seq.

The discussion in the text, however, shows clearly that the New York Court of Appeals does

Application of the *Rosasco/Thistle* exception to the illegality defense calls upon a court to determine whether "denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment." *Rosasco Creameries, Inc. v. Cohen*, 276 N.Y.2d at 278, 11 N.E.2d 908. As stated in *Thistle*, the task is to determine whether "the public interest in the enforcement of contracts is clearly outweighed by the public policy behind the regulation." *Thistle v. Englert*, 103 A.D.2d at 270, 479 N.Y.S.2d 921.

The first policy consideration involved in such a balance is the principle that "the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it.'" *Kelly v. Kosuga*, 358 U.S. 516, 520–21, 79 S.Ct. 429, 430–31, 3 L.Ed.2d 475 (1959) (quoting *Continental Wall Paper Company v. Louis Voight & Sons Company*, 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (Holmes, J., dissenting)). *See McDonald's Corporation v. Robert A. Makin, Inc.*, 653 F.Supp. 401, 404–05 (W.D.N.Y.1986). The primacy of this policy finds expression in those New York cases which abjure substantial forfeitures by reason of an illegality defense, *e.g., Charlebois v. J.M. Weller Associates*, 72 N.Y.2d at 595, 535 N.Y.S.2d

356, 531 N.E.2d 1288, and those which recognize that, when the transaction is before the court "after the agreement between the parties is no longer totally executory," as when the "plaintiff has fully performed its promised exchange[,] ... [s]uch performance critically affects whether enforcement of another party's contractual obligation will be refused on the ground of illegality." *Murray Walter, Inc. v. Sarkisian Brothers, Inc.*, 107 A.D.2d 173, 176–77, 486 N.Y.S.2d 396 (3rd Dept.1985). *See* A.L.I., *Restatement (Second) of Contracts* § 197 comment b (1981) ("the term 'forfeiture' is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange"). *See* 6A A. Corbin, *Corbin on Contracts* § 1512, at 713 (1962) (because "the real defrauder seems to be the defendant who is enriching himself at the plaintiff's expense[,] ... [j]ustice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants."); *id.* § 1521, at 759 (quoted in *Murray Walter, Inc. v. Sarkisian Brothers, Inc.*, 107 A.D.2d at 177, 486 N.Y.S.2d 396).[8]

not consider the public policies behind licensing schemes such as this one strong enough to create an absolute or per se rule voiding contracts made in derogation thereof when the licensing scheme itself fails to include an express remedy voiding such contracts. *Charlebois v. J.M. Weller Associates*, 72 N.Y.2d at 593, 595, 535 N.Y. S.2d 356, 531 N.E.2d 1288; *Rosasco Creameries, Inc. v. Cohen*, 276 N.Y. at 278, 280, 11 N.E.2d 908; *Thistle v. Englert*, 103 A.D.2d at 270, 271, 479 N.Y.S.2d 921. Furthermore, in a case such as this one, in which the defendant asserts the illegality is not one of those targeted for protection by the licensing scheme, the discussion in the text above demonstrates that the rule of forfeiture created in cases like *Richards Conditioning* and by N.Y. C.P.L.R. § 3015(e) simply have no application. *Contract Woodworking Corporation v. Nico Construction Company, Inc.*, 148 A.D.2d at 334, 538 N.Y.S.2d 890; *affing, id.*, N.Y.L.J., April 4, 1988 at p. 16, col. 1; *Parker v. Vista Construction Concepts, Inc.*, 134 Misc.2d at 2, 511 N.Y.S.2d 458. In view of these cases, there is no reason to suppose that New York courts would apply a more absolutist approach

denying enforcement of a wholly executed severable portion of a contract working a substantial forfeiture to the plaintiff than in a case involving a non-severable contract violating licensing schemes. The "policy of preventing people from getting other people's property for nothing when they purport to be buying it" (quoted in text, above) is therefore no less compelling in the context of the 25% provision in the parties' arrangement than it would be if the entire contract was infected with the licensing illegality.

8. A clearly related policy, aligned on the same side of the issue, recognizes the "benefits that lie in creating stability in contract relations and preserving reasonable expectations." *Northern Indiana Public Service Company v. Carbon County Coal Company*, 799 F.2d 265, 273 (7th Cir.1986). In the absence of clear legislative intent to void contracts of this sort, acceptance of defendant's argument "would have this court ride off into uncharted and dangerous territories, in which persons have no certainty that their apparently valid contracts will be en-

The countervailing policies of the registration statute applicable to hearing aid dealers has already been canvassed. It need only be added that the maximum penalty is a $1,000.00 fine, with no provision for imprisonment. Plainly, the policies expressed in N.Y.Gen.Bus.Law §§ 788–796 do not override the policies in favor of holding the parties in this case to their bargain, which has been, with the exceptions described above, fully performed by plaintiff at substantial expense. Plaintiff is, therefore, entitled to enforcement of the contract.

### C. *Defendant's Breach and the Appropriate Remedy*

■ As a preliminary matter it must be observed that the parties did not make any agreement concerning the length of their business relationship. Nor did the parties agree that notice need be given prior to a declaration by one that the relationship should end. Thus, Bruni could not have breached the oral agreement simply by bringing his relationship with the plaintiff to a close, provided ·all other duties were performed. Bruni did not, however, accomplish a satisfactory parting of the ways consistent with the terms of the agreement. A brief history shows why.

Bruni became displeased with his income sometime in January of 1988. He determined to leave Dubois and to do so secretly. Pannette testified that he received a call on Monday, February 8, 1988, during which he learned that Empire had frozen its Rochester accounts from which payments were regularly made to cover advertising and motel expenses for the weekly specials. He directed Melinda Ishman to have Bruni contact him. According to Pannette, when Bruni telephoned, Bruni told Pannette that he would take care of the matter when he was next in Rochester. Pannette told Bruni of the outstanding checks on plaintiff's accounts which needed to be covered. On the strength of Bruni's representations, and without any knowledge of Bruni's plan to leave Dubois, Pannette reassured his bank that deposits would be made.

Pannette never heard from Bruni again, despite numerous phone calls placed to the Empire offices in Rochester. Pannette ultimately made other arrangements to cover the MSI checks advancing funds for the next weeks' specials. Pannette went to Bruni's residence in Dubois, and found that his belongings were removed. Pannette received a letter from Bruni on February 17, dated February 16, which cancelled their agreement and which claimed a breach by plaintiff. Bruni admitted in his testimony that he never spoke with the plaintiff and that he never tried to reach him by phone.

After the breakup, the parties each attempted to contact the customers who had either financed their purchases or paid only a portion òf the purchase price in anticipation of paying the balance upon delivery. Pannette opened a separate bank account into which he deposited revenue generated from the Empire customer contracts which was received after February 8, 1988.

The critical event, of course, was the closing of ·the Lincoln First account. It was upon this account that Bruni had written several checks to the plaintiff pursuant to their agreement to cover advertising and motel costs, which was placed by MSI and which constituted the great bulk of expense incurred to facilitate the "specials." More telling, was the date that Bruni took this action. As is shown in Exhibit 30, the first check drawn on Empire's account marked "refer to maker" was processed on January 29, 1988, in excess of a week prior to Bruni's clandestine departure from Pennsylvania and some two and one-half weeks prior to his February 16th letter

---

forced, despite one side's full performance." *Smith Braedon Company v. Hadid,* 825 F.2d 787, 790 (4th Cir.1987). *See* 6A A. Corbin, *Corbin on Contracts,* § 1376, at 20–21 n. 16 (1962) (quoting *Diamond Match Company v. Roeber,* 106 N.Y. 473, 482–83, 13 N.E. 419 (1887)) and Justice Holmes' statement in *Dr. Miles Medical Company v. John D. Park & Sons Company,* 220 U.S. 373, 411, 31 S.Ct. 376, 386, 55 L.Ed. 502 (1911) ("I think that at least it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear.")).

cancelling the parties' agreement. The account closing occurred well prior to the cessation of the parties' joint project throughout New York, and at a time when plaintiff would justifiably expect payments to cover the cost of running the specials. Bruni gave plaintiff no inkling of his intended conduct. Specifically, Bruni never told plaintiff that he intended to cease running specials in New York or otherwise continue in the employ or as an independent contractor of MSI. As stated, because the parties' agreement was not for a fixed or otherwise determinable term, there would have been no breach if Bruni had simply announced his intention to cancel the agreement and had made satisfactory financial arrangements to bring the relationship to a close. However, by his action in closing the Lincoln First account and his departure to Rochester without a word, and in particular because of his refusal to answer any of plaintiff's numerous telephone calls, I find that Bruni breached the contract. A.L.I., *Restatement (Second) of Contracts* § 235(2) at 211 (1981).

Further, the evidence shows unequivocally that Bruni's conduct constituted a material breach manifesting "an absolute repudiation" of the contract "making it futile [for plaintiff] to proceed." *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 587 (2d Cir. 1989) (quoting *Didier v. Macfadden Publications, Inc.*, 299 N.Y. 49, 53, 85 N.E.2d 612 [1949]). *See Fultonville Frozen Foods, Inc. v. Niagara Mohawk Power Corporation*, 91 A.D.2d 732, 457 N.Y.S.2d 978 (3d Dep't 1982); A.L.I., *Restatement (Second) of Contracts* § 237. Bruni's total failure to communicate with plaintiff concerning his outstanding financial obligations, his secret departure from Dubois, and his February 16th letter cancelling the agreement and claiming a breach by plaintiff fully discharged plaintiff from any further obligations to service hearing aids or to perform warranty work. The evidence shows that, where MSI was notified of particular customers needing service or warranty work after the parties' breakup, it made efforts, sometimes successful, to perform the work. In the vast majority of cases, however, Bruni simply farmed out

the work to Carey Labs or Magnitone by his own unilateral decision. This was consistent with Bruni's manifest effort to fully sever any relationship and to avoid any further contact with plaintiff. In such circumstances, Bruni's breach was material and total.

Accordingly, his counterclaim for damages arising from plaintiff's failure to perform service or warranty work, totalling some $747.94 (*see* Table 1), is without merit; plaintiff's obligation to perform such work was discharged, and in any event was impossible because plaintiff had no notice of those customers needing such work. On the other hand, the evidence, as summarized in Tables 1–6 of the Appendix, supports a judgment in favor of plaintiff in the amount of $42,385.76 (*see* Table 7).

### D. *Motions During Trial to Amend the Pleadings*

■ Toward the end of the trial, plaintiff moved to amend the complaint to include a claim for punitive damages. The motion was, evidently, prompted by plaintiff's discovery, during defendant's testimony, that defendant had closed the Lincoln First account well prior to his secret departure from Dubois. Defendant opposes this motion, arguing that the request to amend was untimely, made in bad faith, and that such an amendment at this late stage would be prejudicial. Defendant, in turn, moved to amend his answer to include an additional affirmative defense of unconscionability.

Rule 15 of the Federal Rules of Civil Procedure governs the amendment of pleadings; it provides that, once a responsive pleading has been served, a party may only amend pleadings "by leave of court or by written consent of the adverse party and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). With respect to the amendment of pleadings pursuant to Rule 15(a), the Supreme Court has held:

Rule 15(a) declares that leave to amend "shall be freely given when justice so requires; this mandate is to be heeded ... In the absence of any apparent or

detailed reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.,—the leave sought should, as the rules require, be "freely given." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Although the Second Circuit has suggested that the proffered amendments "should be tendered no later than the time of pre-trial, unless compelling reasons why this could not have been done are presented," *Evans v. Syracuse City School District*, 704 F.2d 44, 47 (2d Cir.1983) (quoting, *Nevels v. Ford Motor Company*, 439 F.2d 251, 257 (5th Cir. 1971)), amendments proffered after the final pre-trial conference may be granted if the motion meets the "explicit guidelines for amendment of pleadings after the start of trial, provided in Rule 15(b)." *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir.1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987). *See id.*, 795 F.2d 252, 264 (listing general guidelines).

As the Second Circuit recently emphasized,

The "most important question" in considering the propriety of granting such a motion

is whether the new issues were tried by the parties' express or implied consent and whether the defendant "would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory."

*Browning [Debenture Holders' Comm. v. DASA Corp.]*, 560 F.2d [1078,] at 1086 [2d Cir.1977] (quoting 3 J. Moore, *Moore's Federal Practice* ¶ 15.13, at 993 (2d ed. 1966)).

*Royal American Managers, Inc. v. IRC Holding Corporation*, 885 F.2d 1011, 1017 (2d Cir.1989) (bracketed material supplied). As in *Royal American*, the motions by plaintiff and defendant in the case at bar came near the "tail end" of the trial and after virtually all the "crucial witnesses had testified." *Id.* 885 F.2d at 1017, 1018. Neither side offered any substantial excuse for the tardiness of their respective motions, nor did either side point to a specific revelation at trial which was not, or could not have been, discovered prior to trial. Plaintiff did not subpoena defendant's Lincoln First records until the eve of trial; yet discovery of the date defendant closed his account could well have been had by deposition or third party discovery pursuant to Fed.R.Civ.P. 34(c) and 45. Similarly, the facts establishing (or not) an unconscionably defense were peculiarly known to the defendant could have been pled, together with the illegality defense, well prior to trial.

Moreover, both these proffered amendments would add new issues and would presumably require, from the opposing party, discovery and presentation of hitherto undisclosed evidence. For example, a claim for punitive damages in a simple contract action of this sort directs the parties and the finder of fact to, *inter alia*, the unexplored issue whether defendant's conduct respecting his breach of contract constituted "fraud on the plaintiff [which] was 'not an isolated transaction incident to an otherwise legitimate business, but [was rather] a gross and wanton fraud upon the public.'" *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 371 (2d Cir. 1988) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961)).[9] Although it is "well

---

**9.** Although some courts have read *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976) to permit recovery of punitive damages in other kinds of actions absent a showing of public wrong, *e.g.*, *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 880 F.2d 642, 649 (2d Cir.1989) (fraud case); *Getty Petroleum Corp. v. Island Transportation Corp.*, 878 F.2d 650, 657 (2d Cir.1989) (unfair competition action), such a showing remains necessary, under New York law, for a contract action. *Halpin v. Prudential Insurance Company of America*, 48 N.Y.2d 906, 425 N.Y.S.2d 48, 401 N.E.2d 171 (1979); *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976).

settled" New York law that "punitive damages may not be sought as a separate cause of action (*Weir Metro Ambu–Service v. Turner*, 57 N.Y.2d 911, 912, 456 N.Y.S.2d 757, 442 N.E.2d 1268 [1982] [other citation omitted] ... [a] demand for punitive damages may, however, be pleaded as one of several types of damages sought with respect to a legally cognizable cause of action against a defendant." *Sylvester v. Stephens*, 148 A.D.2d 523, 539 N.Y.S.2d 27 (2d Dept.1989). This issue, and others which attend the punitive damages inquiry in an action brought solely for breach of contract, *see id.*, 861 F.2d at 371–72 (collecting cases), are sufficiently distinct from the simple contract breach issue presented at this trial to prevent an amendment at this late stage. *Elema–Schonander, Inc. v. K.C.F. Medical Supply Co., Inc.*, 869 F.2d 1124, 1126 (8th Cir.1989); *United States v. City of Twin Falls, Idaho*, 806 F.2d 862, 875 (9th Cir.1986) (proffered late amendment adding claim for punitive damages would have been properly denied if on the ground of tardiness and prejudice), *cert. denied*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987); *Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir.1985) ("inclusion of a punitive damage claim, well after entry of the final pre-trial order, would have forced the parties to reopen discovery"), *cert. denied*, 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985). *See also Kaiser v. Fishman*, 138 A.D.2d 456, 525 N.Y.S.2d 870 (2d Dept.1988) (denial of proffered amendment upheld because the proof did not meet the standard of *Walker v. Sheldon, supra* ).

Similarly, defendant's request to add the unconscionability defense would force plaintiff to meet issues quite distinct from the primary illegality defense raised in the Answer. Indeed, unconscionability raises several factual issues quite distinct from the simple contract breach at issue during the trial. *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10–11, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988); *State v. Avco Financial Service of New York, Inc.*, 50 N.Y.2d 383, 390–91, 429 N.Y.S.2d 181, 406 N.E.2d 1075 (1980); *Zicari v. Joseph*

*Harris Co., Inc.*, 33 A.D.2d 17, 24, 304 N.Y.S.2d 918 (4th Dept.1969).

It is true that some of the evidence presented during the trial would be relevant to the proffered amendments by the parties. But that fact does not establish that the issues were tried with the implied consent of the parties, nor does it negate the clear prejudice to the opposing side which would attend the granting of either motion at this late stage. *Hillburn by Hillburn v. Maher*, 795 F.2d at 264–65; *Grand Light & Supply Co., Inc.*, 771 F.2d 672, 680 (2d Cir.1985); *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d at 1085–87. *See also, Bernard v. Florida East Coast Railway Company*, 624 F.2d 552, 555 (5th Cir.1980) (fact that evidence was introduced on the new issue "is not enough to satisfy the consent requirement of Rule 15(b)"). Accordingly, both motions are denied.

### E. *Motion for Sanctions*

#### 1. *Pre-Trial Motion for Discovery Sanctions*

Prior to trial, plaintiff brought a motion for default judgment, asking that the Court strike defendant's answer and counterclaim because of defendant's intentional interference with discovery. Specifically, plaintiff alleged that "defendant has been intentionally failing to disclose the existence of key documents and records relative to this case." (Bloch Affidavit, ¶ 3). Plaintiff contends that Bruni consistently claimed in his deposition not to have kept any sales records other than the sales contracts themselves. During his deposition, Bruni stated that he did not keep a master log and that the only document showing his gross sales and expenses were bank statements and his bank book.

After completion of Bruni's deposition, his bookkeeper and the mother of his live-in companion, G. Theresa Buscemi ("Mrs. Buscemi") was deposed. She testified that Empire had a computer into which she recorded all of the transactions during the relevant period. Also, Mrs. Buscemi re-

*See Nelson v. Stanley Blacker, Inc.*, 713 F.Supp. 107, 113 (S.D.N.Y.1989).

vealed that she kept "double records," meaning that in addition to the computer she maintained a separate, handwritten record book. Mrs. Buscemi testified that this day-to-day notebook still existed when she left the employ of Empire.

When Mrs. Buscemi's deposition was finished, plaintiff's counsel understandably requested copies of the computer-stored information and the handwritten record book. Mrs. Buscemi's daughter, Theresa A. Buscemi ("Miss Buscemi"), who was present at the deposition, stated that such discovery would be impossible because the material stored on the computer had been erased. When Miss Buscemi was deposed, she stated that there was no separate ledger detailing sales records. The next day, plaintiff's counsel asked Bruni more questions during which Bruni admitted that Empire had a computer and that sales records had been entered into data banks and printed from that computer. He also admitted that a ledger containing sales transactions was kept.

Based upon this evidence, plaintiff's counsel accused Bruni in his motion papers of committing perjury. Plaintiff contends that Bruni's conduct is punishable by sanctions and that it rendered all of his deposition testimony unreliable. In a responding affidavit, Bruni claimed to be unaware of the handwritten ledger kept by Mrs. Buscemi. He admitted having used a computer in his business, "albeit haphazardly," through May, 1988, "when an employee accidentally erased the hard disk." (Bruni Affidavit ¶ 4). Bruni claimed that, after that time, he got rid of the computer. Bruni asserted that he knew Mrs. Buscemi kept a personal notebook but that he did not consider it to be a business record of Empire. He averred that he did not know the current whereabouts of the notebook. Miss Buscemi, by affidavit, stated that Empire sporadically used a personal computer to store customer information but that the records were accidentally erased by another person. She claimed that "we never considered the computer records to constitute 'written records' nor did we consider the computer records to be 'records of hearing aid sales.'" (Buscemi Affidavit

¶ 2). Further, she claimed that she has searched for the handwritten ledger and was unable to find any such book.

 Because of the devastating implications for defendant of plaintiff's motion, which appeared on papers alone to warrant relief, and because after oral argument of the motion it did not become clearly evident whether defendant, or his defense counsel, was at fault or whether discoverable computer information was intentionally destroyed, I ordered a hearing. *Thomas E. Hoar, Inc. v. Sara Lee Corporation*, 882 F.2d 682, 688 (2d Cir.1989); 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2284, 1988 Supp. at 289 (1970). It is within the District Court's sound discretion to impose sanctions under Fed.R.Civ.P. 37 for failure to comply with a discovery order. *Hull v. Waterbury Petroleum Products, Inc.*, 845 F.2d 1172, 1176 (2d Cir.1988). Although Rule 37 sets forth sanctions which are less harsh than a default judgment, "[t]he mere availability of softer sanctions ... does not bar a court from imposing the default sanction." *Sieck v. Russo*, 869 F.2d 131, 134 (2d Cir. 1989). *See also Update Art, Inc. v. Modiin Publishing Ltd.*, 843 F.2d 67 (2d Cir. 1988). Thus, entry of a default judgment would have been permissible if the evidence supported plaintiff's claim of intentional destruction of evidence. In view of the evidence adduced at hearing, however, it is clear that plaintiff's request for the ultimate sanction of default, and dismissal of the counterclaim, should be denied. On the other hand, the record supports an award in favor of plaintiff of the counsel's fees incurred in the bringing and hearing of the sanctions motion.

First, although the circumstances of defendant's "loss" of computer sales records are highly suspicious, and although defendant was culpable in concealing the existence of the computer and Mrs. Buscemi's handwritten ledger, plaintiff offered nothing but it's speculative assertion of intentional destruction to rebut defendant's proof to the contrary. I do not find the testimony of Julie Davenport, the employee who erased the information compiled in the

computer's hard drive, incredible as a matter of law.

With respect to the other items covered by the motion to compel, however, the record reveals that defendant, and defense counsel, wilfully failed to comply with discovery obligations. The focus at the sanctions hearing was on Exhibits # 1, # 2, and # 3 (Trial Exhibits # 19 [which includes # 19A and # 19B], 20 and 21 [which includes # 21A and # 21B], respectively). These documents included records of hearing aid sales covered by plaintiff's discovery requests. The record fully supports defendant's, and defense counsel's, complete failure to locate and disclose these documents pursuant to plaintiff's discovery requests. Although Mrs. Buscemi testified at trial that Exhibit 1 (Trial Exhibit 19) was prepared at defense counsel's direction in anticipation of litigation, this fact was only hinted at in Miss Buscemi's testimony at the sanctions hearing. If indeed this was the case (Mrs. Buscemi's recollection of relevant events was hopelessly inconsistent in many areas), defense counsel would nevertheless have been duty bound to reveal the existence of the exhibit and move for an appropriate protective order. More significant, the evidence at the hearing, together with the startling revelation at trial that defendant wholly failed to disclose Exhibits MM–16 through MM–46 (original files purporting to evidence cancellations and warranty work) to plaintiff, fully establishes that defendant, and his counsel, wilfully failed to attend to the work necessary to ascertain the existence of other records of the parties' relationship and to make a proper disclosure.

The finding of willfulness is made on the basis of (1) the obvious relevance these documents had to the litigation, and particularly to defendant's counterclaim for service and warranty work expenses, (2) the failure of defense counsel to reveal at the sanctions hearing that Exhibit 1 (Trial Exhibit 19) was prepared at his direction in anticipation of litigation, (3) the fact that defense counsel presented, essentially, a confession and avoidance defense to the motion to compel (i.e., throughout, defense counsel has made the only partly true assertion that these documents were known to plaintiff from its own records and were "plaintiff's documents"), (4) the existence of a prior order of Chief Judge Telesca, dated December 8, 1988, issued in response to a previous motion to compel, which directed defendant to provide relevant documents and interrogatory responses, and which permitted renewal of plaintiff's request for monetary sanctions upon a failure to comply with discovery orders, (5) the inability of the defendant, and defense counsel, thereafter to agree on a discovery timetable, which provoked plaintiff's second motion to compel and which necessitated the March 23rd conference before Chief Judge Telesca and his order dated March 27, 1989, and (6) defense counsel's obstreperous behavior evidenced in the sanctions hearing before me in which he took varying and often shifting positions concerning when he became aware of the documents at issue, when he came into possession of such documents, and when he decided that disclosure should be had by the plaintiff.

I might point out, although it is not necessary to my decision to award sanctions, that defense counsel conducted himself throughout the sanctions litigation in a manner which instilled virtually no confidence in the court of his representations concerning these matters. It was largely because of his lack of credibility, and my consequent suspicion that defendant might not have been the sole culpable party, that I ordered the hearing. Moreover, my view of defense counsel's credibility with respect to the disclosure issues was confirmed by the, again, starting revelation at trial that defendant's records of cancellations and service warranty work (Exhibits MM–16 through MM–46 and other Magnitone and Carey Labs invoices) were simply not disclosed to plaintiff in response to its discovery requests for all records pertaining to the parties' relationship in late 1987 through early 1988. As I stated at the trial, the latter failure was wholly inexcusable, as it is obvious that Sanctions Hearing Exhibit 1 (Trial Exhibit 19) was prepared, at least in part, from Exhibits MM–

16 through MM–46; defense counsel, and the defendant, obviously knew of their existence. The concealment of Exhibits MM–16 through MM–46 further supports my determination of wilfulness with regard to the document exhibits at issue at the hearing. In short, defendant, and defense counsel, either deliberately concealed this material or deliberately failed to ascertain its existence notwithstanding the outstanding discovery order of Judge Telesca, which put all on clear notice that discovery obligations of the defendant needed immediate and careful attention.

Accordingly, an award in favor of plaintiff of the expenses in bringing the motion to compel and prosecuting the sanctions hearing, including attorneys fees, is hereby ordered. In addition, joint and several liability for such expenses is hereby imposed on defendant and his counsel. *Thomas E. Hoar, Inc. v. Sara Lee Corporation,* 882 F.2d at 687, *affing, id.,* unpublished, 1988 WL127076 and 1988 WL95464 (E.D.N.Y. Civ. No. 86–1738 (TCP), November 23, 1988 and September 6, 1988); *Cine Forty–Second Street Threatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir.1979). Plaintiff is ordered to provide a verified and itemized statement of such expenses forthwith and on notice to defendant.

**2. *Rule 11 Sanctions Denied.***

■ By informal motion made in plaintiff's papers submitted upon the conclusion of the trial, plaintiff requests the imposition of sanctions pursuant to Fed.R.Civ.P. 11. Defense counsel has failed to address the issue, raising some question whether he had adequate notice of the application. *The Sanko Steamship Co., LTD. v. Galin,* 835 F.2d 51 (2d Cir.1987). Plaintiff focuses on the asserted lack of merit of the counterclaim. While it is true that defendant's proof of damages fell far short of $40,-000.00, I have found that the parties' agreement encompassed the warranty and service work described in the counterclaim. In addition, although defendant did not recover the true amount of the loss he suffered in connection with the service and warranty work because of his total breach, it cannot be fairly concluded that the counterclaim was frivolous or otherwise so lacking in merit that a sanctions award should be ordered.

## CONCLUSION

Judgment should be entered for the plaintiff in the amount of $42,385.76, consistent with this opinion. The motions to amend the pleadings are denied. The pretrial motion for sanctions on the ground of discovery abuse is granted consistent with opinion. The request for Rule 11 sanctions is denied.

SO ORDERED.

### TABLE 1—EMPIRE SALES ACTIVITY RELEVANT TO PLAINTIFF'S CLAIM.

Material in third column resolves factual disputes. Bracketed material indicates cancelled orders not included in gross sales and hearing aid cost totals.

| Customer Name | Purchase Price | Cancellation or Warranty Work | Hearing Aid Cost |
|---|---|---|---|
| William Seeler | $1,800.00 | No | $478.00 |
| Americo Monti | 1,000.00 | No | 227.50 |
| Rex Buker | [2,000.00] | Cancelled: Bruni testified that Buker sent his aids to Dubois; Exh. MM–39 shows delivery on 11–19–87; both Exhs. MM–39 and V–1 show Telefax handwritten note dated 12–5–87 originating in Clayton, N.Y. from Buker cancelling sale and attaching 30 day cancellation guarantee. Although Exh. 1B and Exh. V–1 show a phone message which appears to schedule a delivery to Buker after the cancellation (a no- | [423.50] |

| Customer Name | Purchase Price | Cancellation or Warranty Work | Hearing Aid Cost |
|---|---|---|---|
| | | tation on the back copy of the message in Exh. 1B has a notation "12–15–88 Delivered L.W." but does not appear contemporaneous with the event), no evidence of any such delivery was offered by plaintiff. | |
| John Johnson | 950.00 | Warranty work performed by Carey Labs on 1–17–89 costing Bruni $41.98 (Exh. JJJ) (within one year warranty—delivery date 1–19–88; Exh. 1B) | 227.50 |
| Gladys Kilmer | 950.00 | No | 227.50 |
| Hazel Rida | 1,900.00 | No | 423.50 |
| Rosemary Shay | 2,000.00 | No | 423.00 |
| Joseph Steinwach | 755.00 | No | 159.00 |
| Joan Thomas | 950.00 | No | 227.50 |
| Michael Fox | 1,000.00 | No | 227.50 |
| Marcella Hartle | 1,400.00 | No | 318.00 |
| Cherlye Kulp | 2,000.00 | Warranty work performed 3–4–88 by Carey Labs costing Bruni $32.00. Exh. CCC and Exh. DDD (notwithstanding Bruni's testimony, those are copies of the same slip with the exception of the 3–23–88 date) | 423.50 |
| Thelma Rehberg | 700.00 | No | 159.00 |
| Nina Roll | 950.00 | No | 227.50 |
| Elsie Merrell | [900.00] | Cancelled: Refund check dated 2–15–88 Exh. M–1. She complained on 12–7–88; Exh. U–1 | [227.50] |
| Harold Bennett | 2,000.00 | No | 423.50 |
| Brice Bowerman | 2,000.00 | (I find that no cancellation occurred. See Exh. MM–16) | 423.50 |
| John Davis | 1,500.00 | No | 318.00 |
| Roy Grau | 750.00 | No | 159.00 |
| Elizabeth Kelley | 2,000.00 | No | 423.50 |
| Waren Morgan | 2,100.00 | No | 423.50 |
| Francis Ruhmel | 1,900.00 | No | 423.50 |
| Dorothy Steiner | 1,900.00 | No | 423.50 |
| Howard Wilcox | 1,650.00 | No | 348.00 |
| Clem Zuckowski | 900.00 | No | 227.50 |
| Carrie Allen | 2,000.00 | No | 423.50 |
| Robert Burgin | 750.00 | No | 159.00 |
| Harold Coon | 2,000.00 | No | 423.50 |
| Pauline Derney | 1,900.00 | No | 423.50 |
| Marian Deyoe | 1,900.00 | No | 423.50 |
| Mary Farrell | 2,000.00 | No | 423.50 |
| Aletha Francisco | 1,900.00 | No | 423.50 |
| Mabel Hadley | 2,100.00 | One aid replaced. Cost to Bruni not revealed in Exhs. MM–20 (see Carey Lab slip) | 423.50 |
| Theodore Haerich | 2,000.00 | No | 423.50 |
| Harold Leboeus | 950.00 | No | 227.50 |
| Lillian Leboeus | 950.00 | No | 227.50 |
| Edward Slavinski | 1,500.00 | No | 318.00 |
| Flossie Stevens | 750.00 | One aid needed replacement. Cost to Bruni $112.50; Exh. MM–18A | 318.00 |
| Elsie Walker | 1,600.00 | No | 318.00 |
| Calvin Warren | 2,000.00 | No | 423.50 |
| Bernice Bliss | 950.00 | No | 227.50 |
| Wilson Oswald | 1,800.00 | No | 423.50 |
| Arthur Putnam | 1,800.00 | No | 423.50 |

| Customer Name | Purchase Price | Cancellation or Warranty Work | Hearing Aid Cost |
|---|---|---|---|
| Victor Quad | 1,900.00 | No | 423.50 |
| John Valone | 1,800.00 | No | 423.50 |
| William Backes | 1,800.00 | No | 423.50 |
| Hazel Bliss | 850.00 | No | 227.50 |
| Kathryn Connell | 1,150.00 | Replacement aid sent by MSI on 3–8–88 was too large; Bruni satisfied her with new fitting from Magnatone at a cost to him of $178.00 [1] | 227.50 |
| Mary Considine | 950.00 | No | 227.50 |
| Eugene Crowley | 1,200.00 | No | 468.00 |
| Anthony Fabio | 1,200.00 | No | 423.50 |
| Bernard Farnsworth | 800.00 | No | 159.00 |
| John Fouquet | 2,200.00 | No | 423.50 |
| Roman Frances | 1,300.00 | No | 318.00 |
| George Frownfeller | [2,200.00] | Cancelled (Stipulated) | [423.50] |
| William Grimsley | 2,200.00 | No | 423.50 |
| Myron Guile | 1,900.00 | No. Sufficient evidence of cancellation or service not presented by defendant | 378.00 |
| Dexter Hathaway | 2,000.00 | No | 423.50 |
| Elizabeth Hernon | 2,000.00 | No | 478.00 |
| Rev. Leo Hetzler | 2,100.00 | No | 423.50 |
| Dorothy Hohn | 1,500.00 | No | 318.00 |
| John Johnson | 1,000.00 | No | 423.50 |
| Gilbert Kinnetz | 850.00 | No | 318.00 |
| Olga Licata | 2,200.00 | No | 423.50 |
| Clara Lichtenwalter | 425.00 | No | 159.00 |
| Hortense Lounsbury | 1,900.00 | No | 423.50 |
| Earl Manley | 1,500.00 | No | 318.00 |
| Jennie Mason | 2,200.00 | No | 423.50 |
| Edith Mottshaw | 2,300.00 | No | 423.50 |
| William Nevin | 2,200.00 | Warranty work performed by Carey Labs 7–5–88 at a $29.50 cost to Bruni (Exh. III) | 423.50 |
| Clara Potter | 2,100.00 | No | 423.50 |
| Norman Rath | 2,200.00 | No | 423.50 |
| Frank Schalau | 2,200.00 | No | 423.50 |
| Grace Schlaffer | [2,200.00] | Cancelled (Stipulated; Exh. MM–8) | [423.50] |
| Alice Smith | 850.00 | No | 159.00 |
| Kenneth Waite | 1,250.00 | No | 423.50 |
| Fred Wenban | 2,200.00 | No | 423.50 |
| Ray Le Borgne | 2,200.00 | Warranty work performed by Carey Labs at a cost to Bruni of $78.00 (Exh. GGG and HHH; see also Exh. MM–35). No evidence of cancellation | 423.50 |
| Arthur Downs | [2,300.00] | Cancelled [2] | [423.50] |

1. Defendant contends that the contract between MSI and him with respect to this customer failed completely because MSI defaulted in the manufacture of the hearing aid. Plaintiff contends that defendant should have rescinded the contract as to this customer when the defect was discovered in order to succeed in his argument. There is no evidence that MSI was notified of the default.

2. I find the following chronology (Exh. MM–25 and Bruni's testimony):

1–29–88 Contract date.
2–3–88 Original delivery.
2–19–88 Customer mails aids to MSI at MSI's request (16 elapsed days).
2–22–88 Customer's letter to Bruni informing him of the mailing.
3–3–88 Delivery of replacement aids to Empire by MSI. No record of when delivery to customer attempted, but a note in the file reveals that the customer refused delivery and a note on the inside cover of MM–25 reveals that delivery had not been made by 3–16–88.
3–17–88 Letter from customer's son explaining circumstances and customer's intent to cancel.

| Customer Name | Purchase Price | Cancellation or Warranty Work | Hearing Aid Cost |
|---|---|---|---|
| Robert Higginbatham | 2,300.00 | No | 423.50 |
| Edward Isaacs | 2,300.00 | No | 423.50 |
| R. Raymond McDonald | [2,200.00] | Cancelled (Stipulated) | [423.50] |
| Robert Beardslee | 850.00 | No | 159.00 |
| Julia Johnson | 850.00 | No | 159.00 |
| Edward Knoblauch | 950.00 | No | 227.50 |
| Mary Moje | 1,750.00 | No | 318.00 |
| June Nostrand | 1,600.00 | · No | 318.00 |
| Anthony Parrinello | 2,000.00 | No | 423.50 |
| Herbert Raff | 1,100.00 | No | 227.50 |
| Mary Raff | 1,100.00 | No | 227.50 |
| Luella Shaw | [850.00] | Cancelled (Stipulated) | [227.50] |
| Floyd Stark | 2,300.00 | No | 423.50 |
| Murray Benham | 2,000.00 | No | 423.50 |
| Bernice Brown | 2,200.00 | No | 423.50 |
| Lura Case | 2,200.00 | No. Insufficient evidence of cancellation offered by defendant (simply a letter from a Canandaigua lawyer); defendant claims she never received delivery. But Exh. 9B contains copies of delivery slips signed by Ronald Wiley and also signed by her, which is corroborated by Exh. 35; although Exh. MM–38 contains a note that letters from Mrs. Case are in "lawyers file," no other evidence of cancellation was offered. | 423.50 |
| Ernest Clark | 1,400.00 | No | 423.50 |
| Phillip Foley | 2,000.00 | No | 423.50 |
| Hazel Gilbert | [2,200.00] | Cancelled: See Exh. M–2 (refund check "in full" for $990.00) (compare Exh. 9B, Exh. MM28 and MM28A, all of which show she made a down payment of $500.00, tried to stop payment on the check, sent another check to Empire for $450, was to pay $1,700 by mail on 2–25–88, was delivered the aids on 2–15–88, and then she ordered two Magnatone aids on 2–17–88. Both MSI aids were cancelled | [423.50] |
| George Gladle | 1,050.00 | No | 227.50 |
| Charles Hapeman | 2,000.00 | No | 423.50 |
| William Kerns | 1,100.00 | No | 227.50 |
| Laura Martino | 2,300.00 | No | 423.50 |
| Violet Ruben | 2,400.00 | Warranty work performed during the 11th month of warranty costing Bruni $91.96 | 423.50 |
| Helen Warner | 2,200.00 | One aid needed replacement; cost to Bruni $184.00; see Exh. MM–17 and MM–17A | 423.50 |

| | |
|---|---|
| 3–30–88 Letter from customer's son accepting communication from Empire that cancellation period had expired on 3-3-90, and offering settlement of the matter. Empire accepts terms offered. | I find cancellation well within the 30 day period, of which only 16 days had elapsed. Empire's notification to customer was incorrect. |

| Customer Name | Purchase Price | Cancellation or Warranty Work | Hearing Aid Cost |
|---|---|---|---|
| Total Gross Sales (less cancellations) | $154,280.00[3] | | |
| Total Service and Warranty Expenses Incurred by Bruni | | $747.94 + unspecified cost of Exh. MM–20 | |
| Total Wholesale Cost to Bruni of Hearing Aids Provided to Customers who did not Cancel | | | $33,619.00 |

### TABLE 2—CALCULATION OF OTHER COSTS [4]

| | | Advertising Costs | Motel Costs |
|---|---|---|---|
| Week | 1 | $10,860.12 | $1,404.23 |
| | 2 | 2,681.28 | 1,020.01 |
| | 3 | 6,143.19 | 908.41 |
| | 4 | 6,331.88 | 1,680.49 |
| | 5 | 4,004.13 | 719.70 |
| | 6 | 11,222.25 | 1,868.42 |
| | 7 | 8,185.86 | 1,021.00 |
| | 8 | 3,834.65 | 1,266.66 |
| | 9 | 5,550.81 | 904.33 |
| Total | | $60,294.77 | $10,793.25 |

### TABLE 3—CALCULATION OF THE PARTIES' NET PROFIT OR LOSS

| | |
|---|---|
| Gross sales price (from Table 1) | $154,280.00 |
| Less: Hearing aid cost (from Table 1) | 33,619.00 |
| Less: Motel cost (from Table 2) | 10,793.25 |
| Less: Advertising cost (from Table 2) | 60,294.77 |
| Less: 25% fee | 38,570.00 |
| Total cost deductions: | $143,277.02 |
| Net profit: | $ 11,002.98 |
| Equal split: | $ 5,501.49 |

### TABLE 4—CALCULATION OF BRUNI'S TOTAL LIABILITY UNDER AGREEMENT

| | |
|---|---|
| 25% of gross sales ($154,280.00) (from Table 1) | $ 38,570.00 |
| Hearing aid cost (from Table 1) | 33,619.00 |
| Motel cost (from Table 2) | 10,793.25 |
| ½ advertising cost ($60,294.77) (from Table 2) | 30,147.39 |
| Plaintiff's net profit share (from Table 3) | 5,501.49 |

**3.** Bruni offered evidence of other warranty work (Exhibits EEE, FFF) and evidence of other cancellations by his introduction into evidence of refund checks. Exhibits MM–3 through MM–7, MM–9 through MM–15; Exhibit AAA (crossed out customers). None of the customers to whom Bruni gave these other refund checks, with the exception of those exhibits listed in the table above, involve customers for whom plaintiff seeks recovery in this action. Furthermore, Bruni offered no evidence of his relationship with plaintiff at the time, mostly prior to week one, these other customers purchased their hearing aids. In addition, it was not established that Bruni and the plaintiff did not resolve the matter of these other cancellations to the parties' mutual satisfaction. The only disputes concretely identified in this trial involve the customers listed above.

**4.** These figures are taken from the Recap Sheets prepared by plaintiff for this litigation. Exhibits 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A and 9A. Admissibility is predicated upon *Beech Cinema v. Twentieth Century Fox–Film*, 622 F.2d 1106, 1110 (2d Cir.1980).

Total Liability Arising from Sales (assuming all gross sales receipts received by
Empire) .................................................................... $118,631.13
Add loan dated 11–27–87 (Exhs. 16, 22) .................................... 3,800.00
Add loan dated 11–14–87 (Exhs. 16, 23) .................................... 5,000.00
Add loan dated 11–16–87 (Exhs. 16, 24) .................................... 4,100.00
Add loan dated 12–12–87 (Exhs. 16, 25) .................................... 1,000.00

Total Liability $132,531.13

---

### TABLE 5—SCHEDULE OF DEFENDANT'S PAYMENTS

| Date of Payment | Corresponding Exhibit | Amount |
|---|---|---|
| Payment 11–23–87 | Exh A1 | $4,000.00 |
| Payment 11–28–87 | Exh A2 | 6,143.19 |
| Payment 11–30–87 | Exh A3 | 3,000.00 |
| Payment 12–4–87 | Exh A4 | 7,000.00 |
| Payment 12–7–87 | Exh A5 | 3,375.00 |
| Payment 12–10–87 | Exh A6 | 3,000.00 |
| Payment 12–12–87 | Exh A7 | 3,000.00 |
| Payment 12–12–87 | Exh A8 | 2,300.00 |
| Payment 12–17–87 | Exh A9 | 4,000.00 |
| Payment 12–18–87 | Exh A10 | 3,000.00 |
| Payment 12–18–87 | Exh A11 | 1,600.00 |
| Payment 12–23–87 | Exh A12 | 2,500.00 |
| Payment 12–24–87 | Exh A13 | 2,800.00 |
| Payment 12–31–87 | Exh A14 | 3,500.00 |
| Payment 1–12–88 | Exh A15 | 1,500.00 |
| Payment 1–19–88 | Exh A16 | 2,000.00 |
| Payment 1–20–88 | Exh A17 | 3,500.00 |
| Payment 1–22–88 | Exh A18 | 6,200.00 |
| Payment 1–25–88 | Exh A19 | 7,000.00 |
| Total Payments | Exh A20 | $69,418.19 |

---

### TABLE 6: CASH (CURRENCY) DELIVERED TO MSI AT END OF SPECIALS OR UPON CUSTOMER DELIVERY [5]

| Customer Name | Exhibit Reference | Amount |
|---|---|---|
| Americo Monti | Exhs. 2C and 34 | $ 300.00(down payment) |
| Americo Monti | Exh. 34 | 700.00(delivery) |
| Elizabeth Kelley | Exhs. 34, T–1 & T–2 | 350.00 |
| Elizabeth Kelley | Exhs. 34, T–1 & T–2 | 50.00 |
| Flossie Stevens | Exhs. 4C, 34 | 100.00 |
| Gladys Kilmer | Exhs. 1C, 34 | 475.00 |
| Joseph Steinwach | Exhs. 1C, 34 | 200.00 |
| Elsie Walker | Exh. 4C | 60.00 |
| Kenneth Waite, Sr. | Exhs. 6C, 35 | 50.00 |
| Kenneth Waite, Sr. | Exhs. 6C, 35 | 150.00 |
| Arthur Downs | Exh. 7C | 750.00 |
| Edward John Knoblauch | Exhs. 8C, 35 | 400.00(down payment) |
| William Kerns | Exhs. 9C, 35 | 1,100.00 |
| Earnest Clark | Exhs. 9C, 35 | 1,400.00 |
| Edward John Knoblauch | Exhs. 9C, 35 | 450.00(delivery) |
| Total Cash Kept by MSI | | $6,545.00 |

5. Witnesses for the defense testified, and Pannette conceded in his testimony, that cash given to the specialists (salespersons) was taken to Dubois every weekend and deposited in plaintiff's accounts. Although Pannette testified that he gave credit to Bruni in his accounting for such cash, Exhibits 1A through 9A and Exhibit 16 reveal that no such credit was given. Accordingly, this table itemizes the amounts of cash together with the corresponding exhibits evidencing cash receipts.

Bruni contends that certain checks were diverted to plaintiff's accounts, but the proof of such diversion involved, in virtually every case, receipts after the relationship had broken down. As shown in Table 7, these receipts are credited to Bruni in the third page of Exhibit 16.

### TABLE 7—CALCULATION OF DEFENDANT'S INDEBTEDNESS TO PLAINTIFF

| | |
|---|---:|
| Bruni's Total Liability (including loans and assuming all gross sales receipts received by Empire) (from Table 4) | $132,531.13 |
| Less: Receipts after Pannette discovered Bruni froze his Rochester account, deposited by MSI in People's Account (Exh. 16) | 12,750.00 |
| Less: Other receipts taken in by MSI through 8–29–88 (Exh. 16) | 1,442.18 |
| Less: Payments made by Bruni to MSI (from Table 5) | 69,418.19 |
| Less: Currency kept by MSI (from Table 6) | 6,535.00 |
| Judgment for plaintiff | $42,385.76 |