MURRAY WALTER, INC., Respondent, v SARKISIAN BROTHERS, INC., et al., Appellants, et al., Defendant.

Third Department, March 7, 1985

## APPEARANCES OF COUNSEL

*Ball & McDonough, P. C.* (*Thomas M. Christina* of counsel), for appellants.

*Delson & Gordon* (*Norman Moloshok* and *Jill S. Levin* of counsel), for respondent.

## OPINION OF THE COURT

LEVINE, J.

Plaintiff is a New York corporation engaged in the construction business. When it was originally incorporated in 1967, there were four shareholders, Murray Walter (100 shares), defendant James F. Matthews (100 shares) and defendants George and John Sarkisian (100 shares jointly). However, the shares owned by Matthews and the Sarkisians were not issued, and their interest not disclosed, because each was engaged as independent construction subcontractors dealing with other general contractors.

In August 1972, stock certificates representing the shares owned by the Sarkisians were issued at their request. At about the same time, disputes arose between Walter and the Sarkisians which, according to plaintiff, significantly impeded its ability to conduct its business. Among other things, the Sarkisians, who were by then principal stockholders of record, refused to personally guarantee plaintiff's performance bonds, rendering it impossible for plaintiff to obtain surety company bonding of its jobs. Additionally, Walter, who actually ran the business, underwent major and seriously disabling surgery. These developments brought on negotiations between Walter and the Sarkisians toward the liquidation of the interest of the Sarkisians in the corporation by purchase or redemption of their shares. According to Walter, the Sarkisians were offered the sum of $400,000 for their interest, representing $50,000 more than the amount called for under a shareholders' agreement in effect among the parties. The Sarkisians, however, demanded an amount approaching $1,000,000.

The disputes between the parties had by this time erupted into litigation. Finally, in 1973, through the efforts of an attorney who had appeared in the litigation as counsel for plaintiff's accountant, an agreement was worked out whereby plaintiff

would redeem the shares owned by the Sarkisians for the sum of $800,000, with the proviso that all the parties would treat the exchange for tax purposes as a payment of the Sarkisians' profit share in a totally unrelated joint venture; plaintiff to report it as an ordinary business expense deduction and the Sarkisians to report it as ordinary income. The Sarkisians further agreed to indemnify plaintiff for one half of any amount disallowed as an expense by Federal and State taxing authorities up to $400,000. In this way, plaintiff alleges, it was agreed and understood that the maximum net cost of the acquisition of the Sarkisian shares would not in any event exceed the sum of $400,000.

The Sarkisians apparently did not report the transaction on their tax return as agreed upon and, in 1975, the Internal Revenue Service began an investigation of plaintiff's 1972 tax return which had included the claimed deduction. The Sarkisians were notified of the investigation, but declined to participate. Ultimately, in 1982, both Federal and State taxing authorities disallowed plaintiff's deduction of the purchase price as a business expense and assessed plaintiff for the full tax deficiency plus interest, totaling more than $800,000. No other civil or criminal penalties were imposed, however, in the final determination.

Upon plaintiff's making installment payments on the assessment, it demanded the promised reimbursement. When this demand was rejected, the instant suit on the indemnity agreement and for fraudulent inducement of plaintiff to enter into the agreement was commenced. The Sarkisian defendants (defendants) interposed a general denial and asserted affirmative defenses based upon the Statute of Limitations and illegality. Pretrial discovery then took place, during which defendants refused to produce various records, including income tax returns for the years 1972 through 1975. Plaintiff accordingly moved to compel such production and defendants cross-moved for summary judgment. When Special Term granted plaintiff's motion to compel production of the records and denied defendants' cross motion for summary judgment, the instant appeal was taken by defendants.

■ The most significant of defendants' contentions on appeal is addressed to Special Term's failure to grant their motion for summary judgment on the basis of their affirmative defense of illegality. It is not seriously disputed by plaintiff that the parties' mutual agreement to falsely report the transfer of $800,000 as a payment to defendants for their share in the

profits of a joint venture totally unrelated to the actual transaction was a violation of Federal tax law, potentially exposing each party to criminal as well as civil liability. However, both the case law and authoritative treatises are in agreement that this alone does not render a contract containing such a promise per se unenforceable on public policy grounds, unless the statute expressly so provides (see, *Kelly v Kosuga,* 358 US 516; *Rosasco Creameries v Cohen,* 276 NY 274, 278; *Farber v Aquino Sons,* 253 App Div 600, 602; Restatement [Second] of Contracts § 178 comment b [1981]; 6A Corbin, Contracts § 1378, at 24-27). In the absence of such an express provision, "[t]he words of the statute must be interpreted, the purposes of the legislature weighed, and the social effect of giving or refusing a remedy considered" (6A Corbin, Contracts § 1378, at 27). Courts and leading commentators suggest various rationales to implement these considerations, all of which, in our view, lead to the conclusion that outstanding issues of fact preclude granting summary judgment on defendants' illegality defense.

Our reasoning initially requires analysis of the actual underlying transaction involving the acquisition of the Sarkisians' interest in plaintiff. According to plaintiff's averments, it was unwilling to purchase the Sarkisians' shares for more than $400,000 and only agreed to pay $800,000 if it could obtain a tax benefit equivalent to the difference by being able to deduct the full price as an ordinary business expense. The Sarkisians agreed to this arrangement and, accordingly, made two promises: (1) to report the receipt of the $800,000 as ordinary income, thereby avoiding any inconsistency with plaintiff's reporting of the transaction; and (2) to reimburse plaintiff in the amount of any tax disallowance of the $800,000, up to a maximum of $400,000. As this analysis demonstrates, the Sarkisians' promise to indemnify plaintiff was not in and of itself illegal, certainly not in the same sense as the promise falsely to report the transaction. As Special Term cogently observed, the indemnification provision was inserted primarily to insure that, whatever the tax consequence of reporting the full price as a deductible expense, plaintiff's net cost for redeeming the Sarkisians' corporate stock would not exceed $400,000. This is confirmed by the absence in the agreement of any promise to defend plaintiff in a tax proceeding or to underwrite any penalties or fines resulting therefrom (cf. *McBrearty v United States Taxpayers Union,* 668 F2d 450).

Of further significance is the fact that this transaction is now before us after the agreement between the parties is no longer

totally executory. In fact, plaintiff has fully performed its promised exchange by paying a price for the Sarkisians' interest which it claims was more than double that called for under the shareholders' agreement between the parties. Such performance critically affects whether enforcement of another party's contractual obligation will be refused on the ground of illegality. "While the bargain is wholly executory, there is no serious injustice in denying enforcement to either party. After either party has performed substantially, the denial of all remedy would disproportionately penalize him; and the public welfare is best served by either compelling restitution or enforcing the other's promise proportionately" (6A Corbin, Contracts § 1521, at 759). Once the party seeking such enforcement has substantially performed his obligations, "the court should consider the quality of the illegality, the extent of public harm, the relative guilt of the parties, and the cruelty of the forfeiture involved in a denial of remedy" (*ibid.*).

The foregoing equitable considerations weigh heavily against finding that, as a matter of law, indemnification under the agreement should be barred for illegality. First, as previously pointed out, under plaintiff's version of the facts, the indemnification obligation was not by itself illegal, was not given in exchange for an illegal act, and only becomes suspect insofar as it served as an inducement for the parties to falsely report the transaction. Essentially, defendants' two tax-related promises made in consideration of the payment of the $800,000 consisted of one which was illegal (to falsely report the transaction) and the other (to indemnify) which was legal on its face. Where a promisee has thus given lawful consideration for two promises, one legal, the other illegal, enforcement of the lawful promise may be permitted (*Central N. Y. Tel. & Tel. Co. v Averill*, 199 NY 128, 140-141). Second, without deprecating the importance of the public policy against tax evasion, plaintiff's papers set forth certain circumstances mitigating the moral turpitude of its acts, among them, that the Internal Revenue Service, the agency directly responsible for enforcing tax policy, chose not to impose either criminal sanctions or civil penalties; that defendants took unfair advantage of their superior bargaining position and the ill health of Walter to impose an inflated redemption price; and that Walter believed that the tax benefits plaintiff would derive from reporting the payment as a business expense would be offset by defendants' tax burden for reporting it as ordinary income.

Lastly and most importantly on the illegality issue, if plaintiff's averments are to be believed, a refusal to enforce the

indemnification clause would work a substantial forfeiture upon plaintiff while permitting defendants, who are at least equally culpable, to retain the entire financial benefits of the transaction. To avoid such a result, courts have severed the lawful from the unlawful obligations of the contract for enforcement purposes (*McCall v Frampton,* 81 AD2d 607, 608-609), estopped the assertion of an illegality defense (*Bonta v Gridley,* 77 App Div 33, 39), or simply held that unless the judgment sought would itself enforce the precise conduct prohibited by the relevant statute, "the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, 'of preventing people from getting other people's property for nothing when they purport to be buying it' " (*Kelly v Kosuga,* 358 US 516, 520-521, *supra* quoting *Continental Wall Paper Co. v Voight & Sons Co.,* 212 US 227, 271 [Holmes, J., dissenting]). It is to be noted that the contract in the *Kelly* case involved a violation of the Federal antitrust laws, the public policy against which is presumably at least as strong as that against violation of the Federal revenue laws. For all of the foregoing reasons, resolution of defendants' illegality defense must await a plenary trial of the issue.

We turn next to the question of whether Special Term correctly denied defendants' cross motion for summary judgment dismissing plaintiff's second cause of action on the basis of the Statute of Limitations. That cause of action is grounded in fraudulent inducement of the 1973 purchase agreement by the Sarkisians' false assurances that the maximum net cost of the transaction to plaintiff would not exceed $400,000. The applicable periods of limitation in such a fraud action are six years from the commission and two years from the discovery of the fraud (CPLR 203 [f]; 213 [8]; *Lazzaro v Kelly,* 87 AD2d 975, 977, *affd* 57 NY2d 630). Defendants argue that any fraud relating to their intention not to comply with the agreement was at the latest disclosed in 1975 when it became evident that the $800,000 had not been reported by them as ordinary income. However, the alleged assurance that the redemption of the Sarkisian shares would cost plaintiff not more than a net of $400,000 involved not only their promise to report the entire proceeds as ordinary income, but also their promise to indemnify plaintiff for up to $400,000 of any disallowance of its payment as a business expense. There has been no conclusive showing that defendants' intention not to keep this promise was revealed until receipt of defendants' letter of February 2, 1981, in which they stated that they had "no stake" in the Internal Revenue Service investigation of the claimed deduction. Since this suit was commenced well within two years of the date of that letter, Special Term

correctly denied defendants summary judgment on the basis of the Statute of Limitations.

■ Finally, it was well within Special Term's discretion to order disclosure of relevant financial records and tax returns from the various defendants, in light of the issues already described involving the ownership and value of the shares defendants held in plaintiff and the tax treatment by the parties of the redemption transaction. However, Special Term's order went beyond the disclosure requested by plaintiff in requiring production of records for the years 1971 through 1983. On oral argument of this appeal, plaintiff's attorney conceded that the relevant period ended in 1975. Accordingly, the order appealed from should be modified by striking so much thereof as required the production of records of tax returns for the years 1976 through 1983. In all other respects, the order should be affirmed.

CASEY, J. P., WEISS, MIKOLL and HARVEY, JJ., concur.

Order modified, on the law, with costs to plaintiff, by striking so much thereof as directs disclosure by way of the production of defendants' records and tax returns for the years 1976 through 1983, and, as so modified, affirmed.