*202 OPINION OF THE COURT
Kenneth R. Fisher, J.
The above action was commenced by a complaint dated July 6, 2007. An answer was served on or about August 28, 2007, and a reply to counterclaims was dated October 1, 2007. The complaint alleges that the plaintiff entered into an agreement with the defendant Rare Spirits, Inc. (identified as Century Liquor) in 2001 to purchase wine futures from foreign wine suppliers on behalf of Century Liquor and that Century Liquor agreed to purchase the wine purchased pursuant to the wine futures; that plaintiff prepaid approximately $619,758.36 for the wine futures; that Century Liquor thereafter, for a quantity of wine that is the subject of the complaint, directed the wine suppliers to deliver the wine to wholesalers other than the plaintiff; and that Century Liquor has not paid the sum claimed by the plaintiff to be owed to it by Century Liquor. The complaint also alleges that the defendant Nicole’s Wine & Spirits, Inc. purchased the assets of Century Liquor and continued the business of Century Liquor resulting in a de facto merger between Century Liquor and Nicole’s Wine & Spirits.
The complaint contains the following four causes of action: (1) Breach of Contract: that Century wrongfully took possession of the wine and failed to pay the plaintiff for the purchase of the wine and that, upon information and belief, Nicole’s Wine & Spirits expressly or impliedly assumed “some or all of the liabilities of Century Liquor and is thus liable in whole or part” to the plaintiff; (2) Unjust Enrichment-, that Century Liquor received the wine purchased by the plaintiff without paying for the wine and that “equity and good [conscience] dictates that the plaintiff is entitled to payment for the wine delivered to Century.” This second cause of action also alleges that Nicole’s Wine & Spirits expressly or impliedly assumed Century Liquor’s liabilities and is liable “in whole or in part” to the plaintiff; (3) Promissory Estoppel: that Century Liquor promised “to purchase the wine in question” from the plaintiff; that the plaintiff relied on that promise; and that Century Liquor breached its promise. This third cause of action also alleges that Nicole’s Wine & Spirits expressly or impliedly assumed Century Liquor’s liabilities and is liable “in whole or part” to the plaintiff; and (4) Conversion: that Century Liquor wrongfully converted possession of the wine. This fourth cause of action also alleges that Nicole’s Wine & Spirits expressly or impliedly assumed Century Liquor’s liabilities and is liable “in whole or in part” to the plaintiff.
*203 The defendants’ answer denies the existence of the agreement as set forth in the complaint and, while admitting that Nicole’s Wine & Spirits purchased some of the assets of Century Liquor, it denies that there was de facto merger or that Nicole’s assumed the liabilities of Century. The answer contained four affirmative defenses: the complaint failed to state a valid cause of action; the agreements alleged in the complaint did not comply with section 5-701 of the General Obligations Law; the agreements alleged in the complaint violated the Alcoholic Beverage Control Law and were illegal, void and unenforceable; and the alleged agreements were governed by the law of contracts and consequently, the unjust enrichment and promissory estoppel claims are unavailable to the plaintiff.
The answer also contains two counterclaims: the first counterclaim alleges that plaintiff, in order to induce Century to purchase alcoholic beverages from the plaintiff, gave Century discounts on the price of the alcoholic beverages purchased; that the amount of the discounts or credit adjustments due Century Liquor (termed a “Bank” by the parties) exceeds the amount claimed by the plaintiff; and that Century Liquor is entitled to an accounting by the plaintiff for the amount of the “Bank.” The second counterclaim alleges that the amount of the “Bank” owed by the plaintiff to Century Liquor is in excess of $705,812.
When defendants moved to compel discovery of purchase orders, invoices, payment records, price schedules filed by Eber with the State Liquor Authority (SLA), and documentation of the “Bank” of Eber’s discounts to Century Liquor, together with records of the various credit adjustments made when purchasing the French wine which is the subject of the complaint, plaintiff responded with a cross motion for partial summary judgment on the first cause of action for breach of an oral contract in the amount of $619,758.36. Defendants in turn responded with a motion for summary judgment declaring that the parties relationship was illegal and that therefore the complaint should be dismissed. Although a thorough reading of all the motion papers and exhibits yields a pretty clear picture of the nature of the parties’ relationship, and what each party did to lead to this dispute, the competing motions for summary judgment must be parsed for the purpose of determining whether each party has met its respective burden according to settled principles of summary judgment jurisprudence in this state.
*204 It is well settled that “the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact.” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986] [citations omitted]; see also Potter v Zimber, 309 AD2d 1276 [4th Dept 2003].) “Once this showing has been made, the burden shifts to the nonmoving party to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact that require a trial for resolution.” (Giuffrida v Citibank Corp., 100 NY2d 72, 81 [2003], citing Alvarez, 68 NY2d at 324.) “Failure to make such showing requires denial of the motion, regardless of the sufficiency of the responsive papers.” (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985] [citation omitted]; see also Hull v City of N. Tonawanda, 6 AD3d 1142, 1142-1143 [4th Dept 2004].) When deciding a summary judgment motion, the evidence must be viewed in the light most favorable to the non-moving party. (See Russo v YMCA of Greater Buffalo, 12 AD3d 1089 [4th Dept 2004].) The court’s duty is to determine whether an issue of fact exists, not to resolve it. (See Barr v County of Albany, 50 NY2d 247 [1980]; Daliendo v Johnson, 147 AD2d 312, 317 [2d Dept 1989].)
Contending that any documentation regarding the discounts, credits or “Bank” created by Eber for Century’s account were not material or necessary to defend the action, because any such arrangement was declared invalid by consent decrees issued by two Supreme Court Justices in Erie County actions brought by the Attorney General in September 2006 (Fahey, J.) (Eber) and January 2007 (Curran, J.) (Century), Eber maintains that it is entitled to summary judgment because it is undisputed that Century caused it to order foreign wines (Century could not itself legally purchase wine directly from foreign suppliers) which it ultimately received but did not pay for. Eber alleges that the parties entered into an agreement in 2001 under which Eber would purchase the foreign wines at Century’s behest, store the wine in its warehouse once shipped to the United States, and Century would pay for the wine once delivered to Eber’s warehouse. Eber describes the arrangement “solely as an accommodation” to Century, which was disabled by law from making the purchases itself.
In support of the motion, Lester Eber lists the foreign suppliers from whom the purchases were made in his affidavit, all from France, and attaches the invoices and a spreadsheet, *205 described as “Eber Bros, worksheet itemizing the payments made by Eber Bros.” Eber’s affidavit alleges that, beginning sometime in “2006 or 2007, Century directed the [French] suppliers to deliver wine that had been paid for by Eber Bros, to a wholesaler other than Eber Bros, and, thereafter, [directed shipment] to Century” thus bypassing Eber Bros. Contending that Century never “denied accepting these shipments nor has it denied not paying for the wine” despite demand therefor, plaintiff is entitled to summary judgment in the amount of $619,758.36, “together with interest.”
Evidently seeking to divorce the question of discounts, credits, rebates, and the issue of the “Bank,” from issues of breach of the parties’ contract in regard to the French suppliers, Eber also sought as part of its cross motion denial of Century’s discovery motion concerning the credits and “Bank,” and summary judgment dismissing Century’s counterclaim for an accounting of the “Bank” of credits and for the $705,812 Century claimed it was owed. Eber attached the two consent orders above described, one of which prohibited Eber Bros, from a number of business practices that were the subject of the Attorney General’s lawsuit, including prohibiting Eber Bros, and others “from directly or indirectly, providing retailers [such as Century] with any form of rebate or discount that has not been filed in price schedules with the SLA, such as a credit against future purchases,” with exceptions not relevant here. The consent order made no finding of illegality on Eber Bros.’ part but fined Eber Bros, as “a civil penalty, pursuant to ABCL § 17 (3) and New York General Business Law Art. 22-A,” in the amount of $175,000 (Eber Bros.) and $200,000 (Eber-NDC, LLC), together with $10,000 in costs for each Eber entity.
Given that Century’s answer alleged that Eber Bros,
“provided and gave to Century credits, credit adjustments and discounts . . . which . . . were applied and issued by the plaintiff to reduce the purchase price of alcoholic beverages purchased by Century from the plaintiff and also reduced the price of the wine futures referred to in the complaint below the price schedules filed with the New York State Liquor Authority, all of which violated the New York Alcoholic Beverage Control Law” (answer 1Í 7 [a]),
and because the answer otherwise fully detailed the alleged arrangement in its two counterclaims, it would have been incumbent on plaintiff, in order to meet its initial burden of *206 proof on summary judgment, to allege that, prior to the entry of Justice Fahey’s consent decree, the parties’ relationship in regard to payment for the foreign wine purchases did not include use of the business practice alleged by Century in its answer and which would clearly violate Alcoholic Beverage Control Law § 101-b (3) (b) if it, in fact, existed. This Eber did not do (indeed the reply to counterclaims filed on behalf of plaintiff acknowledged vaguely that “from time to time until October 2005” Eber Bros, “provided certain discounts to Century” [reply to counterclaims 1i 3]). Therefore, plaintiff in support of its cross motion, “failed to present evidence establishing the relationship between the parties” (James V. Aquavella, M.D., P.C. v Viola, 39 AD3d 1191, 1192 [4th Dept 2007]), sufficient to discount the theory that the parties’ relationship in regard to the foreign wine purchases was not plagued by illegality. Accordingly, Eber Bros.’ cross motion for summary judgment must be denied regardless of Century’s showing.
In addition, the failure of Eber Bros, to admit that the parties’ relationship in regard to paying for the foreign wine indeed included adjustments of the discount or credit “Bank” alleged by defendants as being in violation of the Alcoholic Beverage Control Law requires denial of this aspect of plaintiffs cross motion seeking dismissal of the counterclaims. The vague acknowledgment in plaintiffs reply to counterclaims that “from time to time” it “provided certain discounts to Century” does not establish the nature of the discounts as being violative of the Alcoholic Beverage Control Law, nor does it tie in an illegal discount to the payment terms of the contract/arrangement between the parties in regard to the foreign wine purchases. The mere fact of the consent decrees’ declaration that the business practice in question was prohibited, and the injunction prohibiting Eber Bros., Century and others from engaging in the same, without a finding or admission that Eber Bros, and Century indeed had committed the illegal practice, does not alone establish that the parties’ relationship in regard to payment for foreign wine purchases before entry of the decrees was, in fact, illegal such that plaintiff is entitled to summary judgment dismissing the counterclaims. I would only add that the consent decrees are “going forward” injunctions only, as defendants contend. Because plaintiffs cross motion for dismissal of the counterclaims is based entirely on the terms of the consent decrees themselves, which have no express application to the relevant time period, it is not properly supported.
Turning to defendants’ motion for summary judgment dismissing the complaint, defendants establish through the affi *207 davit of Century’s vice-president and chief operating officer, Michael Misch, that the “Bank” established by Eber for discounted liquor and other wine sales from Eber Bros, to Century during the relevant time period was central to the payment scheme devised by the parties for the foreign/French wine purchases which are the subject of the complaint. Misch alleges that,
“[sjtarting in the 1990’s and continuing to the year 2006, Eber (through its employees, particularly it’s President Lester Eber) in connection with the purchase by Century of alcoholic beverages from Eber, provided and gave to Century credits, credit adjustments and discounts and which credits, credit adjustments and discounts were applied and used by Eber to reduce the purchase price of wines purchased by Century from French wine suppliers below the price schedules filed by Eber with the New York State Liquor Authority (SLA).”
Misch alleges further that Eber Bros.’ corporate pricing director, Carey Brairton, told him “that the amount of the credits, credit adjustments and discounts would constitute a ‘Bank’ of funds available from French wine suppliers.” Misch alleges that Brairton “maintained all of the records on Century’s Bank,” and that Eber Bros, “would use Century’s Bank to pay the purchase price of the wine” and that “[tjhe amount of the Bank would increase as Century purchased alcoholic beverages from Eber and would be reduced as the Bank was used by Century to buy French wines.” Misch supplied copies of what he contends are Eber Bros.’ records of the “Bank” and its various adjustments from time to time. According to Misch, “Eber never invoiced Century for any of the French wines purchased pursuant to the aforesaid ‘Bank’ agreement since there never was any payment due and Eber never made any demand on Century for payment” and “never invoiced Century for the French wines.” Misch also alleges that Century paid every invoice ever sent to it by Eber Bros, and within the 30-day time period of Alcoholic Beverage Control Law § 101-aa. He asserts that section 101-aa requires payment by a retailer to a wholesaler within 30 days, in the absence of which the wholesaler must notify the SLA of the delinquency which is then processed by SLA on a retailer delinquency list. “Once a retailer is placed on the delinquency list, it must pay cash (C.O.D.) for all purchases.” Because Eber Bros, never invoiced Century for the French wine, it did not notify SLA of any delinquency, which assuredly it was obligated to do if plaintiffs claims in this case had any merit, and therefore *208 section 101-aa is alleged to have been violated by plaintiffs collection effort in this lawsuit.
While the court does not agree that collection of unreported delinquencies by a wholesaler is prohibited by section 101-aa (Alcoholic Beverage Control Law § 101-aa [8]; Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124, 127-128 [1992]), defendants establish via the Misch affidavit that the basis of the complaint is an agreement for the purchase and delivery of French wines which contains an illegal payment term, i.e., out of the proceeds of discount pricing on other products in violation of Alcoholic Beverage Control Law § 101-b (3) (b), not (a) as defense counsel contends in his affidavit. The court, however, is guided by the principles articulated in a well reasoned decision as follows:
“It is well settled that contracts which violate statutory provisions are, as a general rule, unenforceable on public policy grounds where the statute which is violated is enacted to protect the public health and safety (Richards Conditioning Corp. v Oleet, 21 NY2d 895, 896-897 [1968]), or where the statute’s ‘ “purpose [is] the protection of public . . . morals or the prevention of fraud.” ’ (Benjamin v Koeppel, 85 NY2d 549, 553 [1995], quoting Galbreath-Ruffin Corp. v 40th & 3rd Corp., 19 NY2d 354, 364 [1967]; see also Gutfreund v DeMian, 227 AD2d 234, 235 [1st Dept 1996].)
“The rationale for refusing to enforce such contracts is not based upon a ‘desire to relieve a party from the obligation which he has assumed, but rather is based upon the theory that such an agreement is injurious to the interests of society in general, and that the only way to stop the making of such contracts is to refuse to enforce them.’ (Village of Upper Nyack v Christian & Missionary Alliance, 143 Misc 2d 414, 421 [Sup Ct, Rockland County 1988]; see McConnell v Commonwealth Pictures Corp., 7 NY2d 465, 469 [1960] ‘ “ ‘a party to an illegal contract cannot ask a court of law to help him carry out his illegal object’ . . . ‘No one shall be permitted to profit by his own fraud . . . or to found any claim upon his own iniquity’ ” ’ (citations omitted)].) Contracts which violate a statute may be enforced, however, ‘[i]f the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract’ (Lloyd Capital *209 Corp. v Pat Henchar, Inc., 80 NY2d 124, 127 [1992], quoting Rosasco Creameries, Inc. v Cohen, 276 NY 274, 278 [1937]), and if the Toss of judicial recourse would ... be out of proportion to the requirements of public policy or appropriate individual punishment.’ (Wowaka & Sons v Pardell, 242 AD2d 1, 5 [2d Dept 1998].) Courts are also more amenable to enforcing such contracts ‘where there are [other] regulatory sanctions and statutory penalties in place to redress violations of the law’ (Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d at 128), or where the party who is alleged to have breached the contract is attempting to improperly use public policy ‘as “a sword for personal gain rather than a shield for the public good.” ’ (Id. at 128, quoting Charlebois v Weller Assoc., 72 NY2d 587, 595 [1988].)
“Thus, whether a particular contract is unenforceable on illegality grounds depends upon the nature of the statutory provision which is violated by the contract, and the legislative purpose for which it was enacted. Accordingly, in resolving the question of whether a particular contract is enforceable, courts ‘should . . . examine the particular regulatory scheme involved and decide how to further the purposes of the statute compatibly with what is fair.’ (Todisco v Econopouly, 155 AD2d 441, 447 [2d Dept 1989, Rosenblatt, J., concurring]; see also Benjamin v Koeppel, 85 NY2d at 553-556; Thistle v Englert, 103 AD2d 268, 270-272 [4th Dept 1984].)” (Alsaedi v Alsaedi, 177 Misc 2d 440, 442-443 [Civ Ct, Kings County 1998].)
A full discussion of the Rosasco Creameries and Richards Conditioning holdings is contained in the undersigned’s decision in Marketing Specialists, Inc. v Bruni (129 FRD 35, 44-48 [WD NY 1989], affd 923 F2d 843 [2d Cir 1990]), and need not be repeated here except to point out that the primary consideration in cases of this sort is that “ ‘the courts are to be guided by the overriding general policy, as Mr. Justice Holmes put it, “of preventing people from getting other people’s property for nothing when they purport to be buying it” ’ ” (id. at 48, quoting Kelly v Kosuga, 358 US 516, 520-521 [1959], quoting Continental Wall Paper Co. v Louis Voight & Sons Co., 212 US 227, 271 [1909, Holmes, J, dissenting]), a principle finding expression in those New York cases which abjure substantial forfei *210 tures by reason of an illegality defense (e.g. Charlebois v Weller Assoc., 72 NY2d at 595), and those which recognize that, when the transaction is before the court “after the agreement between the parties is no longer totally executory,” as when the “plaintiff has fully performed its promised exchange [,]... [sjuch performance critically affects whether enforcement of another party’s contractual obligation will be refused on the ground of illegality.” (Murray Walter, Inc. v Sarkisian Bros., 107 AD2d 173, 176-177 [3d Dept 1985]; see Restatement [Second] of Contracts § 197, Comment b [1981] [“the term ‘forfeiture’ is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance, on the expectation of that exchange”]; 6A Corbin, Contracts § 1512, at 713 [1962] [because “the real defrauder seems to be the defendant who is enriching himself at the plaintiffs expense!,) . . . (j)ustice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants”]; id. § 1521, at 759, quoted in Murray Walter, Inc. v Sarkisian Bros., Inc., 107 AD2d at 177.) This is, assuredly, one of those cases.
Defendants contend that this primary consideration is overcome by the statutory declaration in Alcoholic Beverage Control Law § 101-b (1), which directly addresses the pricing scheme alleged by defendants in this case:
“It is the declared policy of the state that it is necessary to regulate and control the manufacture, sale, and distribution within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate the undue stimulation of sales of alcoholic beverages and the practice of manufacturers and wholesalers in granting discounts, rebates, allowances, free goods, and other inducements to selected licensees, which contribute to a disorderly distribution of alcoholic beverages, and which are detrimental to the proper regulation of the liquor industry and contrary to the interests of temperance, it is hereby further declared as the policy of the state that the sale of alcoholic beverages should be subjected to certain restrictions, prohibitions and regulations. The necessity for the enactment of the provisions of this *211 section is, therefore, declared as a matter of legislative determination.” (Emphasis supplied.)
Whether a violation of section 101-b, in light of the quoted statutory language, concerns the public health and safety (Richards Conditioning Corp. v Oleet, 21 NY2d at 896-897) depends on a finding that the statute’s purpose was “ ‘ “the protection of public . . . morals or the prevention of fraud.” ’ ” (Benjamin v Koeppel, 85 NY2d 549, 553 [1995], quoting Galbreath-Ruffin Corp. v 40th & 3rd Corp., 19 NY2d 354, 364 [1967].) Defendants contend in their memorandum that the cases of Carmine v Murphy (285 NY 413 [1941]), O’Connor v O’Connor (263 App Div 820 [2d Dept 1941], affd 288 NY 579 [1942]), Flegenheimer v Brogan (284 NY 268 [1940]), Birnbaum v Schuler (56 AD2d 556 [1st Dept 1977]), and especially Sale v Montrose Indus. Bank (179 Misc 915 [1943], mod on other grounds 269 App Div 762 [2d Dept 1945]), all compel the conclusion that this case also implicates an illegality defense under statutes which have as their “purpose ... [a] regulatory scheme ... to protect the public health and safety.” (Richards Conditioning Corp. v Oleet, 21 NY2d at 896.) But this does not alone establish prima facie entitlement to summary judgment as a matter of law dismissing the complaint, leaving the parties to their own devices. (Thistle v Englert, 103 AD2d 268, 270 [4th Dept 1984] [requiring a balancing of interests even when the regulatory scheme concerned public health and safety, and adding that, “where the Legislature has included sanctions in the statute, the added penalty of unenforceability of contracts should be avoided when it causes great and disproportionate hardship”].)
There is another line of cases providing a hurdle which defendants fail to surmount, viz., those cases which hold that, where the transaction may be divisible into its legal and illegal components, “[t]he complaint should not be dismissed . . . unless the legal part of the business . . . became so interwoven with whatever part may have been illegal that it is impossible to separate them.” (Rosenblum v Frankel, 279 App Div 66, 67 [1st Dept 1951] [“(c)ourts endeavor to enforce contracts against a defense of illegality, unless an illegal taint affects the transactions on account of which the court is to be set in motion”] [involving a joint venture allegedly violating the state liquor laws].) Where a
“contract sought to be enforced is legal on its face and does not contemplate or require conduct in violation of the . . . laws in its performance . . . the critical question is whether the contract is so *212 integrally related to the [illegal aspects of the] . . . arrangement . . . that its enforcement would result in compelling performance of the precise conduct made unlawful by the [statute].” (X.L.O. Concrete Corp. v Rivergate Corp., 83 NY2d 513, 518 [1994].)
In such cases, as in this one in which the core contract between the parties involved Eber Bros.’ agreement to procure foreign wines for Century as an accommodation, in return for payment therefor, and therefore was legal on its face, “[w]hether the contract was an indivisible, effectuating component of an illegal [payment] arrangement . . . is a question that requires further development at trial.” (Id. at 518; see G.K. Alan Assoc., Inc. v Lazzari, 44 AD3d 95, 103 [2d Dept 2007] [“the defense of illegality should be resolved at trial”].) “Where a promisee has thus given lawful consideration for two promises, one legal, the other illegal, enforcement of the legal promise may be permitted.” (Murray Walter, Inc. v Sarkisian Bros., 107 AD2d at 177, citing Central N.Y. Tel. & Tel. Co. v Averill, 199 NY 128, 140-141 [1910].) Defendants do not show as a matter of law on the facts alleged the indivisibility of the core bargain, and thus do not meet their initial burden on summary judgment.
Although unnecessary to the decision, consideration is given to plaintiffs responding papers to determine whether an issue of fact is raised even assuming arguendo that defendants met their initial burden. In responding to Century’s cross motion for summary judgment, plaintiff submits the affidavit of Brairton, who denies only (1) that he kept records of the “Bank” (he says he kept records solely of the French wine purchases), (2) that the amount of Century’s “Bank” was as stated in the Misch affidavit (he provides no firm figure but alleges from prior running accounts that it was much less than claimed), and (3) that Century used its “Bank” to prepay for the wines at issue in this litigation. Brairton describes the “Bank” genetically as instead arising from invoices for the French wine issued to Century (evidently on wines other than are at issue in this litigation) in amounts “substantiality] discounted] off Eber’s actual costs” incurred by procurement and importation of the French wines. If this was all there was to the “Bank,” it would not constitute an illegal practice unless the discounted prices were not in accord with pricing schedules filed under Alcoholic Beverage Control Law § 101-b (3) (a) (relating to liquor and wine “sold to or purchased by a wholesaler”), which is cited in defense counsel’s affidavit but in relation to facts which implicate section 101-b (3) (b) (“sold to or purchased by retailer”) only.
*213 Brairton does not explicitly deny, however, that the “Bank” also involved discounts extended to Century on the latter’s purchase of other wine and liquor products from Eber Bros. Nor does he explain how Eber could determine the “discount (or ‘Bank’) it was providing to Century,” exclusively from the French wine purchases themselves (Brairton aff 11 6 at 3), and nevertheless invoice Century for a portion of its costs, and make the downward adjustments to the “Bank” described in paragraph 6 of his affidavit. In other words, Brairton does not describe how a bank of credits in favor of Century could have been created solely from the discounts off Eber’s costs of importation and delivery that Eber allegedly gave to Century. Why would any particular transaction involving a substantially discounted price to Century result in a still further credit to Century in the form of an upward adjustment of the “Bank”? According to Brairton, the “Bank” was already there, and the individual transactions in French wine he describes in paragraph 6 resulted in a price (whether then discounted off Eber’s costs Brairton does not say) from which Eber took partial payment by check in an invoiced amount and the balance in a downward adjustment of the “Bank.” Brairton never describes in what form the discounts off the price of importation and delivery to Century took, and how the “Bank” was created (i.e., increased) by any particular transaction in French wine as he genetically alleges as described above. For these reasons, the failure to deny the existence of the “Bank” in relation to the illegal pricing scheme for other wine and liquor products as described in the Misch affidavit is significant. In other words, the paragraph 6 descriptions of the parties’ payment arrangement do not negate the allegation that the “Bank” consisted also of discounts extended by Eber Bros, for Century’s purchases from Eber of other non-French wine and liquor products, as alleged in the Misch affidavit, and that therefore use of the “Bank” even in the manner described by Brairton involved an illegal scheme under section 101-b (3) (b).
Although the failure to deny or allege facts sufficient to negate that the “Bank” did not also consist of illegal discounts or credits for other wine and liquor purchases in violation of the filed-schedule regulations would be fatal to plaintiffs position that no illegality was involved, the Brairton affidavit effectively asserts that, with respect to the French wines which are the subject of this litigation, Century’s unauthorized conduct in having the French suppliers divert the wine to a Mt. Morris, *214 New York wholesale distributor, and then arranging for direct delivery to Century thus bypassing Eber Bros., effectively prevented the illegal aspects of their bargain from ever being brought to bear on the transactions at issue. If determination of and adjustments to the “Bank” occurred only when Eber Bros, invoiced the French wine then in its possession, then the illegal part of the payment scheme could not have plagued a transaction diverted to another wholesaler and bypassing Eber altogether. Accordingly, even if defendants had met their initial burden of proof showing that the illegal aspects of the transaction could not be divorced from its legal aspects, plaintiff raised an issue of fact that they were divisible for the particular wines at issue in this litigation.
Century’s motion for summary judgment dismissing the complaint is denied. The original motion for an order compelling discovery is granted. The motion for summary judgment dismissing the complaint against Nicole’s Wine & Spirits, Inc. is denied without prejudice to renew after discovery. Counsel’s simple statement that no merger occurred is insufficient to establish entitlement to summary judgment. (CPLR 3212 [f]; Bancker Constr. Corp. v County of Suffolk, 204 AD2d 1067 [4th Dept 1994]; cf. Simpson v Ithaca Gun Co. LLC, 50 AD3d 1475 [4th Dept 2008].)